**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**HARRISBURG DIVISION**

| | |
|---|---|
| 1789 FOUNDATION INC., d/b/a CITIZEN AG, and ANTHONY GOLEMBIEWSKI, <br><br> *Plaintiffs,* <br><br> v. <br><br> AL SCHMIDT, in his official capacity as Secretary of State, and COMMONWEALTH OF PENNSYLVANIA, <br><br> *Defendants.* | Case No.   3:24-cv-01865 |

---

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

Dated: October 29, 2024

Respectfully submitted,
1789 FOUNDATION, INC. d/b/a
CITIZEN AG and ANTHONY GOLEMBIEWSKI

By: /s/ *Gregory A. Stapp*
     Gregory A. Stapp (PA #78247)
     153 West Fourth Street, Suite 6
     Williamsport, PA 17701
     Tel: (570) 326-1077
     Fax: (570) 651-9420
     gstapp@stapplaw.net

By: /s/ *Rachel L. Dreher*
     Rachel L. Dreher * (FL #32092)
     CITIZEN AG
     111 NE 1st St, 8th Floor
     Miami, FL 33132
     Tel: (561) 801-8661
     rachel@citizenag.org
     **pro hac vice* forthcoming

1

## BACKGROUND

The National Voter Registration Act of 1993 ("NVRA" or the "Act") was enacted for two stated purposes: first, to "increase the number of eligible citizens who register to vote" and "enhance[]" their "participation ... as voters in elections for Federal office"; and second, "to protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The NVRA seeks to increase voter participation in several ways. The latter objective—ensuring election integrity and accurate, current voter rolls—is governed by Section 8 of the Act, which is the subject of this lawsuit. 52 U.S.C. § 20507.

Section 8 of the NVRA requires Defendants to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" a registrant's death or change in residence. *Id.* § 20507(a)(4). And it also requires a state-designated "chief State election official to be responsible for coordination of State responsibilities" under the Act. *Id.* § 20509.

The NVRA provides that the registrations of those who have moved out of a jurisdiction may only be cancelled in two ways. First, those who confirm a change of address in writing are removed from the rolls. 52 U.S.C. § 20507(d)(1)(A). Second, registrants are also deemed to have changed their residence when they are sent a "postage prepaid [] pre-addressed return card" by forwardable mail asking them to confirm their address (the "Confirmation Notice"), fail to respond to it, and then fail to "vote[] or appear[] to vote" for two general federal elections—basically, a period of roughly four years—are removed from the rolls. *Id.* § 20507(d)(1)(B) & (d)(2).

Registrants who fail to respond to confirmation notices are not removed but rather, are designated as "inactive" voters for the duration of the pre-removal statutory waiting period. 11 C.F.R. § 9428.2(d). Inactive registrants, all of whom remain registered voters, are not prohibited

2

from voting during that period, so long as they comply with the provisions of 52 U.S.C. § 20507(e) applicable to their unique scenario. According to 52 U.S.C. § 20507(e), a registrant who has moved within the same jurisdiction but did not respond to a confirmation notice or notify the registrar of the registrant's change of address prior to the election can still vote; however, the registrant must first provide oral or written affirmation of his or her change of address before an election official at the polling place in order to be permitted to vote. 52 U.S.C. § 20507(e). This provision ensures that the voter can still participate in the election despite not having updated their address information earlier.

In the event an inactive registrant votes during the statutory waiting period—which here, means voting in either the 2020 General Election and/or 2022 Midterm Election—the registrant's voter registration status is switched from "inactive" back to "active" and the registrant is no longer subject to the NVRA's removal process. But unless an inactive registrant affirmatively reactivates him or herself prior to the expiration of the statutory waiting period, the NVRA requires Pennsylvania to remove the formerly inactive registrant—who becomes an ineligible voter the day following the second consecutive federal election—from the State's voter rolls. Pennslyvania has no discretion concerning its NVRA-imposed removal obligation, as "federal law makes this removal mandatory." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 767 (2018) (citations omitted).

In furtherance of ensuring accurate voter rolls, States are required to retain and make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id*. § 20507(i). Although it does not list all the records this might include, the NVRA does set forth one specific example: "The records maintained . . . shall include lists of the names and addresses of all persons to whom [Confirmation Notices] are sent, and information concerning whether or

not each such person has responded to the notice …" 52 U.S.C. § 20507(i)(2). Other examples of records the NVRA requires States to maintain include *inter alia* voter history records, including those that reflect whether any inactive registrant who has not yet been removed votes or otherwise reactivates his or her registration by contacting the registrar at any time during the statutory waiting period. *Id.* § 20507(d)(2)(A); *see, e.g., Voter Reference Foundation, LLC v. Torrez*, 2024 WL 1347204 at \*139 (D.N.M. Mar. 29, 2024) (holding Secretary of State's Office violated the NVRA by failing to produce "[c]urrent voter registration data, **including voter history**, for all active, inactive, suspended, and cancelled status voters.") (emphasis added).

Depending on when a violation occurs, a person aggrieved by a violation of the NVRA is required to provide written notice to a state's chief election official, which here, is Secretary of State Al Schmidt, either 90 or 20 days before bringing a civil suit. 52 U.S.C. § 20510(b)(1) & (2). There is an exception to this notice requirement, however, that vacates the obligation to tender notice to the chief state election official when a plaintiff is aggrieved by an NVRA violation within 30 days of a federal election. *Id.* § 20510(b)(3).

As discussed below, Plaintiffs have been aggrieved for the reasons set forth in their Verified Complaint (ECF No. 1) that alleges (1) Defendants violated the NVRA's public inspection provision on October 11, 2024 when it denied Citizen AG's October 4, 2024 open records request that sought records concerning how many of the voters that did not respond to confirmation notices sent via forwarded mail before the 2020 General Election voted in either the 2020 or 2022 federal elections.

Defendant Schmidt, who is Pennsylvania's chief State election official, *see* 25 Pa.C.S. § 1201, has failed in his duty to coordinate state responsibilities under the Act, and as a direct and proximate result of Defendant Schmidt's non-compliance with the provisions of the NVRA's

public inspection provision, Defendants have failed to make available NVRA-covered documents that Citizen AG requested in its October 4, 2024 open records request.

The support for these allegations derives primarily from Defendants' own admissions and statements made in responding to a survey conducted every two years by the federal Election Assistance Commission ("EAC") as it prepares a mandatory report to Congress. 52 U.S.C. § 20508(a)(3); 11 C.F.R. § 9428.7. Plaintiffs additionally rely on Secretary Schmidt's October 11, 2024 letter which he directly, or indirectly through his agents, employees, officers, or other officials, denied Plaintiffs' October 4, 2024 open records request. (ECF No. 1 at ¶¶ 35, 49, 68; *see also* ECF No. 1-6 at ¶¶ 23-25 (referencing Decl. Ex. 4).

Due to the impending and rapidly approaching federal election on November 5, 2024, and the need to protect all Of Pennsylvania's voters' fundamental right to vote against improper voter removal and vote dilution, Plaintiffs submit this memorandum of points and authorities along with their emergency *ex parte* motion for temporary restraining order and preliminary injunctive relief.

Plaintiffs have complied with all requirements under the Federal Rules of Civil Procedure and the Local Rules of this Court that impose conditions precedent or other pre-requisites that must be satisfied prior to filing this action and seeking the instant emergency *ex parte* relief.

## LEGAL STANDARD

Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a temporary restraining order ("TRO") or preliminary injunction. *See Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 Fed. Appx. 25, 27 (3d Cir. July 27, 2016) (applying one standard to a motion for both a TRO and preliminary injunction). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Apple Inc.*

*v. Samsung Electronics Co.*, 695 F.3d 1370, 1373–74 (Fed. Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008)). The Supreme Court has emphasized that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). However, upon a clear showing that the Plaintiff is entitled to such relief, awarding preliminary relief is indeed, appropriate and warranted. *See Groupe SEB USA, Inc. v. Euro–Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter*, 555 U.S. at 22).

## ARGUMENT

## I. PLAINTIFFS HAVE STANDING TO BRING THIS ACTION

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).

An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (citing *Lujan*, 504 U.S. at 560). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist[,]" meaning that is "'real,' and not 'abstract.'" *Spokeo*, 578 U.S. at 340 (citations omitted). "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. An injury may be "fairly traceable" even if it is not the "the very last step in the chain of causation.*" Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). In this case, Plaintiffs have each individually alleged concrete and particularized injuries that are directly traceable to Defendants' failure to comply with the NVRA's public inspection provision governing the records sought in

Plaintiff's October 4, 2024 open records request submitted pursuant to Pennsylvania's Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101, *et seq.*

### A. Citizen AG has Organizational Standing to Bring this Action

The Third Circuit has recognized that an organization such as Citizen AG standing to bring a claim where (1) the organization itself has suffered injury to the rights and/or immunities it enjoys; or (2) where it is asserting claims on behalf of its members and those individual members have standing to bring those claims themselves. *See Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009). An organization may demonstrate injury sufficient for standing if the Defendants' actions "perceptibly impair" the organization's ability to provide services. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285 (3d Cir. 2014) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)).

As explained in the Verified Complaint and Declaration filed in support thereof, Citizen AG's core activities include advocating for the preservation of civil liberties and constitutional rights by means that include petitioning the government when civil liberties and constitutional rights are threatened. (ECF No. 1 at ¶ 4; ECF No. 1-6 at ¶ 5); *see* e.g., *National Ass'n for Advancement of Colored People v. Button*, 471 U.S. 415 (1963) (holding engaging in litigation to redress infringements of constitutional rights is a form of advocacy and exempt purpose under 501(c)(3) of the IRS Code).

Citizen AG's involvement in this action began when it learned through one or more of its members who are residents and eligible registered voters of the State, that their fundamental right to vote was in jeopardy because of the vote dilution directly caused by Pennsylvania's list maintenance practices. Upon learning this, Citizen AG began investigating Pennsylvania's list maintenance practices, researched the applicable state and federal laws that govern list maintenance practices, and searched for all publicly available election and voting-related records

7

that related to or potentially could have related to Pennsylvania's list maintenance activities, and compiled all relevant cases, studies, reports, research, data, and other findings to begin investigating the specific nature, magnitude, and origin of the then-alleged and now-confirmed improper list maintenance activities in the State. *See* ECF No. 1 at ¶¶ 60-61, 81; *see also* 1-6, Scharfenberger Decl. at ¶¶ 11-13. Citizen AG then read, reviewed, and extrapolated all relevant information from its library of documents, reports, and records compiled by Citizen AG, at the expense of substantial resources, including without limitation, time, effort, and finances, that otherwise would have been allocated and expensed towards its other initiatives.

In particular, Citizen AG expended substantial resources in analyzing the data and responses that Pennsylvania's Secretary of State provided to the EAC in response to its EAVS, and Citizen AG drafted and sent correspondence to the Secretary of State's office after its investigation revealed the one and only possible justification that could alleviate Pennsylvania of liability of its otherwise objective and irrefutable violations of the NVRA.

The aforesaid resources were substantial and encompassed hundreds of hours, numerous staff members, and caused Citizen AG to divert its work away from other projects in furtherance of its exempt purpose—all of which resource costs are "distinct from and above and beyond Citizen AG's regular, programmatic efforts expended towards educating Americans about their rights and advocating for civil rights and liberties." Indeed, but-for Pennsylvania's failure to comply with the NVRA, Citizen AG would have expended these same resources on its regular, programmatic activities or would not have expended them at all.

Accordingly, and because Defendants' failure to comply with the NVRA is the direct and proximate cause of Citizen AG's expenditure of the aforesaid substantial, concrete, real, and actual injuries, it is not subject to reasonable dispute that Citizen AG has organizational standing in satisfaction of the United States Constitution's Article III's "case-or-controversy" requirement.

8

*See e.g., Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789-790 (W.D. Tex. 2015) ("monitor[ing]" state activities, "compil[ing] statistics," meetings, "discussions", and research before filing suit regarding a state's failure to comply with the NVRA's list maintenance provisions is sufficient to establish organizational standing).

### B. Citizen AG has Associational Standing to Bring this Action.

"[T]o have associational standing" is to have the power to sue on behalf of its own members, and is established by an organization upon a showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to [its] purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The complaint here alleges that "individual members of Citizen AG who are lawfully registered to vote in Pennsylvania" are injured by Defendants' noncompliance with the NVRA, and this noncompliance "undermin[es] their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted." ECF No. 1 at ¶ 55. This allegation states an injury that would allow Judicial Watch's members "standing to sue in their own right." *Hunt*, 432 U.S. at 343. This injury is based on the Supreme Court's observation that:

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised.

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *see Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197 (2008) (while "closely related to the State's interest in preventing voter fraud, public

confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process").

In *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind. 2012), Judicial Watch alleged that its members were injured by "Indiana's failure to comply with the NVRA list maintenance requirements because that failure 'undermin[es] their confidence in the legitimacy of the elections … and thereby burden[s] their right to vote.'" In denying a motion to dismiss for lack of standing, the court cited *Crawford* and reasoned that "[i]f the state has a legitimate interest in preventing" the undermining of voters' confidence, "surely a voter who alleges that such harm has befallen him or her has standing to redress the cause of that harm." *Id.* & 924 n.6 (finding that Judicial Watch had associational standing to represent its members who are registered to vote in Indiana). Other courts have reached the same conclusion. *See Green v. Bell*, No. 3:21-cv-00493, 2023 U.S. Dist. LEXIS 45989, at *10 (W.D.N.C. Mar. 19, 2023) (claims that "North Carolina's 'inaccurate rolls' undermine [the plaintiffs'] confidence in the state's elections, which further 'burdens their right to vote[] … qualify as injuries in fact"); *Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1104 (D. Colo. 2021) ("undermined confidence and discouraged participation are [not] 'common to all members of the public.' … Nor are these fears speculative or hypothetical. … plaintiffs are not worried that their confidence could be undermined at some point in the future; their confidence is undermined now.") (citation omitted).

While Citizen AG is a relatively new organization, it has already amassed a membership base in 37 of the 50 states, among which include numerous members from Pennsylvania. Moreover, Plaintiffs respectfully submit that there is perhaps no more succinct and fair means of grappling with the issue of associational standing than that of the Ninth Circuit. In *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015), the Ninth Circuit set forth

a simplistic yet encompassing standard for questions of associational standing and held in pertinent part:

> Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.

*Id.* Nonetheless, even if this Court were to decline to find Citizen AG has associational standing, the Ninth Circuit has instructed that when dismissing an action for lack of associational standing[1], the District Court should "grant[] leave to amend." *Id.* But that leave is proactively cured for as one Citizen AG member and Pennsylvania resident, Anthony Golembiewski, joins Citizen AG in this action.

### C. Plaintiff Anthony Golembiewski has Standing to Bring this Action.

Mr. Golembiewski satisfies the Article III standing requirement because she is an American citizen and Pennsylvania resident and a Citizen AG member registered to vote in Allegheny County. As one of the Commonwealth's registered voters, Mr. Golembiewski's fundamental right to vote is directly impacted by Pennsylvania's NVRA noncompliance, there can be no doubt nor any non-frivolous argument that challenges Mr. Golembiewski's standing to bring this action.

## II. PLAINTIFFS ARE ENTITLED TO EMERGENCY INJUNCTIVE RELIEF

Plaintiffs' Verified Complaint asserts two (2) causes of action: Counts I arises pursuant to the NVRA's public inspection provision, which states in pertinent part:

---

[1] Plaintiffs' argument is fortified against any concerns regarding Article III standing as Citizen AG also has organizational standing to bring this action. Even more, a third fail-safe measure is present in this case as one of Citizen AG's members, Anthony Golembiewski, is a co-Plaintiff in this action. Mr. Golembiewski, who resides within the Commonwealth, is one of hundreds of thousands of registered, eligible Pennsylvania voters whose fundamental right to vote is at risk of being undermined by way of vote dilution.

> Each State shall maintain for **at least 2 years** and shall make available for public inspection and, where available, photocopying at a reasonable cost, **all records** concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

*See* 52 U.S.C. § 20507(i)(1) (emphasis added). More specifically, **Count I** is brought based upon Defendants' failure to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . .".

**Count II** is brought pursuant to Section 8 of the NVRA which among other things, requires Defendants to "establish a removal-from-registration program that "makes a reasonable effort" to remove voters who become ineligible for reasons that include, without limitation, change-of-residence grounds, to "ensure that accurate and current voter registration rolls are maintained." Complt. ¶ 89;  52 U.S.C. §§ 20501(b)(3), (4).

There is no question as to whether Defendants violated Count I, as no records have been provided, and Defendants have denied Plaintiffs October 4, 2024 open records request. (ECF No. 1 at ¶¶ 35, 49, 68; ECF No. 1-6 at ¶ 23). And while Count II is admittedly not as indisputably established, the only reason Defendants' liability for violating Section 8 of the NVRA is not yet as irrefutably calcified as their liability under Count I is *because of* Defendants' liability under Count I.

Stated differently, if Defendants could have avoided liability under Count II that alleges Defendants violated Section 8 of the NVRA by failing to remove more than a quarter-million voters by doing nothing more than producing the records Plaintiffs requested, it is not subject to reasonable dispute that any litigant, including Defendants would have produced the records. But

Defendants did not produce the records for inspection, and instead, denied Plaintiffs' request unlawfully by extending the response date to November 12, 2024, which beyond the allotted 30 days after the initial 5 business days. *See* 65 Pa. Stat. § 67.902(b) ("If the date that a response is expected to be provided is in excess of 30 days, following the five business days allowed for in section 901, the request for access shall be deemed denied unless the requester has agreed in writing to an extension to the date specified in the notice."). As such, there is no dispute as to Defendant's liability under Count I.

Notably, and despite Plaintiffs' position that Defendants are liable on both counts, Pennsylvania still has at least 277,768 inactive voters on its registration lists, all of whom are registered to vote just days before the 2024 General Election. And while no non-frivolous argument can be asserted that, as of November 9, 2022, these 277,768 inactive registrants were required to have reactivated their registration statuses by (1) voting in the 2020 or 2022 federal elections; or (2) the registrant was required to have been removed for more than 700 days pursuant to the well-established precedent set forth by the Supreme Court that again, makes clear: Pennsylvania has no discretion concerning its NVRA-imposed removal obligation, as "**federal law makes this removal mandatory.**" *Husted*, 584 U.S. at 767 (2018). For nearly two years, Defendants have flouted their obligations under federal law and offered no reason as to why these inactive—and as of November 9, 2022, ineligible—voters remain listed as inactive. Despite this, Plaintiffs emphasize to the Court that they do remain cognizant of the utmost care that must be dedicated to ensuring no American's fundamental right to vote is undermined.

As such, and in light of the impending November 5, 2024 election, Plaintiffs do not seek the removal of these voters in filing this motion; that is an issue that can be thoroughly and carefully addressed when the parties are afforded sufficient time to conduct discovery. For that reason, the relief Plaintiffs seek in filing this emergency *ex parte* motion for a temporary

restraining order merely asks that this Court (1) enjoin Defendants from further violating the NVRA's public inspection provision by compelling the State to make records that reveal how many of the more than quarter-million registrants that are registered to vote were inactive prior to the 2020 General Election because of their failure to respond to a confirmation notice, yet actually cast a ballot in either the 2020 General Election or 2022 Midterm Election.

And while Plaintiffs also seek additional injunctive relief, it must be unequivocally made clear that Plaintiffs do not ask this Court to remove any voter from the registration lists at this time or at any other time prior to the 2024 Presidential Election; instead, Plaintiffs simply seek to protect the fundamental right to vote for all Pennsylvanians, which includes not only protecting voters against being improperly removed from voter rolls, but also encompasses the guarantees that protect all Voters who reside in the Commonwealth' votes against dilution under similar principles as those discussed in *Baker v. Carr*, 369 U.S. 186 (1962), and the landmark decision establishing the "one-person-one-vote" doctrine.[2]

And for the reasons set forth and explained below, Plaintiffs are entitled to emergency *ex parte* injunctive relief that enjoins Defendants from counting any vote cast by a Pennsylvania inactive registrant who was inactive due to his or her failure to respond to a notice prior to the 2020 General Election and also did not vote in either of the last two federal elections, **unless the registrant appears in-person on Election Day and confirms his or her residence** as required pursuant to 52 U.S.C. § 20507(e) (making mandatory a voter's in-person presence at a polling place a condition precedent of reactivation after failing to respond to a confirmation notice).

//

//

---

[2] While the one-person-one-vote doctrine established in *Baker v. Carr* was under the context of vote dilution that arose out of unlawful gerrymandering, the salient principle remains the same: all Americans are entitled to equal weight of their votes, irrespective as to what causes any registrant's vote to be diluted.

14

### III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR PUBLIC INSPECTION PROVISION CLAIM (COUNT I).

As explained above and based upon the evidence and declarations submitted in support of their emergency *ex parte* motion for a temporary restraining order, it is not subject to reasonable dispute that Plaintiffs are likely to succeed on the merits of their claims alleging Defendants have violated the NVRA's public inspection provision.

On October 4, 2024 Plaintiffs submitted an open records request to Secretary Schmidt, as the "Chief State Election Official" 15 Pa.C.S. § 1201 requesting the following records:

1. Records and/or data that reflect the total number of confirmation notices sent to Pennsylvania voters from November 7, 2018 through November 3, 2020;

2. Records and/or data that reflect the total number of responses to the aforesaid notices you or the State of Pennsylvania received confirming the recipient is an eligible voter;

3. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice;

4. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice but voted on November 3, 2020;

5. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice and did not vote on November 3, 2020, but did vote on November 8, 2022.

6. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice, did not vote on November 3, 2020, and did not vote on November 8, 2022.

7. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice, did not vote on November 3, 2020, did not vote on November 8, 2022, and have been removed from Pennsylvania's voter rolls at any time from November 9, 2022 through present.

8. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the

notice, did not vote on November 3, 2020, did not vote on November 8, 2022, and have been not been removed from Pennsylvania's voter rolls as of present.

Scharfenberger Decl. at ¶¶ 21-22, 26 (referencing Decl. Ex. 3).

On October 11, 2024, Defendants responded by informing Citizen AG they would need until November 12, 2024 to provide a "final response", which is an estimated date beyond the maximum of 30 days after the initial 5 business days. *See* 65 Pa. Stat. § 67.902(b) ("If the date that a response is expected to be provided is in excess of 30 days, following the five business days allowed for in section 901, the request for access shall be deemed denied unless the requester has agreed in writing to an extension to the date specified in the notice."). And as of the date of this filing, Citizen AG's request was denied and remains denied, as evidenced by the fact that no responsive records were provided or made available. *Id.* at ¶¶ 25-26 (referencing Decl. Ex. 4).

Based on the aforesaid alone, there is no question that Plaintiffs are substantially likely to prevail on the merits of Count I because Defendants denied Plaintiff's request in violation of the NVRA, and Defendants cannot lodge a non-frivolous argument to exculpate themselves of liability for denying Citizen AG's request. Plaintiffs likewise are substantially likely to prevail on the merits of Count II, as Defendants have 277,768 registered voters unaccounted for, who have not responded to a confirmation notice, and who have also not voted in the 2020 General Election or 2022 Midterm Election yet remain on the rolls in violation of 52 U.S.C. § 20507(d)(1)(B).

## IV.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR SECTION 8 CLAIM (COUNT II).

Stated frankly, Secretary Schmidt's reported statistics concerning the number of confirmation notices sent, the number of responses the State received, and the number of voters removed after two federal election have passed do not add up and the discrepancy is anything but insignificant. To the contrary, based on the figures Pennsylvania reported to the EAC, there are at least 277,768 inactive registrants who remain registered to vote been removed or having the

registrant's inactive status reactivated due to voting or complying with the terms of 52 U.S.C. § 20507(e).

To summarize the in-depth explanation of the figures as provided in the Verified Complaint, Pennsylvania reported sending via forwarded mail 753,942 registered voters confirmation notices (inclusive of return cards) via forwarded mail prior to the 2020 General Election. Of the 753,942 confirmation notices sent to registered Pennsylvania voters, only 116,042 registrants responded. Based on these figures, a minimum of 637,900 registrants were sent confirmation notices via forwarded mail and did not respond, resulting in their registration statuses being switched to "inactive" prior to the 2020 General Election.

After the 2022 Midterm Election, Pennsylvania reported to the EAC that it removed 360,132 registrants of the 637,900 registrants who did not respond to the confirmation notices sent to them by the Commonwealth via forwarded mail. When taking the 637,900 registrants who did not respond to their confirmation notices before the 2020 General Election and subtracting the 360,132 registrants that Secretary Schmidt reported the Commonwealth removed after the next 2 federal elections, there remains a total of 277,768 registered voters on Pennsylvania's voter rolls as of the filing date.

It is statistically improbable, if not impossible, that 277,768 out of 277,768 inactive registrants reactivated their registration statuses in compliance with 52 U.S.C. § 20507(e). And while it is likely that some of these inactive registrants did vote in 2020 or 2022, the point remains: all 277,768 inactive registrants should be either removed for failing to vote in 2020 or 2022, or active because they *did* vote in 2020 or 2022. But under no circumstance should these 277,768 registrants still be inactive as of the date of this action's filing.

Accordingly, and in addition to Count I, Plaintiffs are also substantially likely to prevail on the merits of Count II alleging violations of Section 8 of NVRA regarding the list maintenance requirements with which Pennsylvania must comply.

## V. THE BALANCE OF EQUITIES HEAVILY TIP IN PLAINTIFFS' FAVOR

The balance of equities tips sharply in Plaintiffs' favor and every other registered voter of the Commonwealth. As made clear throughout the Verified Complaint and this memorandum, the relief Plaintiffs seek in filing this emergency *ex parte* motion does not seek to remove any voters prior to the November 5 election; in fact, this motion is filed to protect all Pennsylvanians registered to vote. Active or inactive, eligible and even those who became eligible after the statutory waiting period expired on November 9, 2022, the relief Plaintiffs seek merely asks that this Court enjoin Defendants from further violating two (2) provisions of the NVRA: the public records provision, 52 U.S.C. § 20507(i), and the list maintenance provision, 52 U.S.C. § 20507(d)(1)(B).

The balance of equities tips heavily in Plaintiffs' favor because the request sought does not ask this Court to deprive any inactive registrant of frankly, anything—to the contrary, instead of seeking their removal from the rolls, which Plaintiffs' undoubtedly could do as the law compels it, Plaintiffs are asking that this Court merely enjoin Defendants from ignoring the NVRA's list maintenance provision by requiring that Defendants *at least* adhere to the requirements under 52 U.S.C. § 20507(e); all of which are applicable to inactive registrants who now seek to vote.

To rule in favor of Plaintiffs would be to protect the fundamental right to vote for millions of Pennsylvanians; indeed, nobody is being removed from the rolls, even those who should have been more than 700 days ago. Meanwhile on the other hand, to rule against Plaintiffs is to guarantee millions of Pennsylvania's active, registered voters will have their fundamental right to

vote undermined by vote dilution, which is expressly one of the objectives the NVRA was enacted to eradicate. There is no question as to the balance of equities tipping in Plaintiffs' favor.

Given the imminence of the November 5, 2024 election and the fact that the harm Plaintiffs will suffer absent immediate judicial intervention, coupled with the fact that the integrity of the election cannot be restored once compromised, the equitable and injunctive relief requested is not only necessary to protect Plaintiffs' voting rights but essential to all Pennsylvanians alike.

## VI.    INJUNCTIVE RELIEF IS IN THE PUBLIC'S BEST INTEREST

In addition, injunctive relief is in the public's best interest. Protecting the integrity of elections is a matter of public concern, as it ensures that all eligible voters' rights are preserved and that the electoral system functions fairly. Public interest favors transparent and accurate voter rolls, which this injunction seeks to enforce through compliance with the NVRA's requirements.

By ensuring that voter registration records are publicly available and accurately maintained, the injunction promotes transparency, accountability, and public confidence in the election process. This confidence is essential for encouraging voter participation and ensuring fair representation in the democratic process. Allowing ineligible voters to remain on the rolls could undermine the principle of "one person, one vote," a fundamental tenet of democratic governance that injunctive relief aims to protect. The relief requested not only addresses the plaintiffs' concerns but also advances broader public policy interests, ensuring fair and lawful elections.

Injunctive relief in this case is unequivocally in the public's best interest. The public has a significant interest in ensuring the integrity of elections, which is foundational to democratic governance. Compliance with the National Voter Registration Act (NVRA) is central to maintaining accurate and current voter rolls, preventing both the disenfranchisement of eligible voters and the dilution of legitimate votes. By requiring Pennsylvania to make voter registration

records available for public inspection and accurately maintain voter rolls, the requested injunction promotes transparency, accountability, and confidence in the electoral process.

The injunction does not seek to immediately remove any voter from the rolls but rather aims to enforce federal law to ensure that only eligible voters participate in the upcoming election. This precaution protects the principle of "one person, one vote" and ensures that the fundamental right to vote is not undermined by the presence of ineligible voters who remain on the rolls due to non-compliance with statutory requirements. Preserving this integrity aligns with established Supreme Court precedent, which has emphasized the need to maintain public confidence in the election process to encourage citizen participation in democracy.

Furthermore, accurate voter rolls reduce administrative burdens on election officials, ensuring smoother election administration, particularly in high-turnout elections. When voter rolls are current and correct, election resources are better allocated, minimizing potential delays, confusion, or errors at polling places. Thus, the requested injunction serves the broader interests of fair, lawful, and efficient elections. Granting the injunctive relief requested and entering a temporary restraining order not only serves to protect the rights of Plaintiffs, but Pennsylvania voters at-large. but also furthers public policy by ensuring lawful elections, reinforcing the democratic process, and upholding the public's trust in the electoral system. As such, the public interest strongly favors granting the relief requested.

## VII. THE RELIEF SOUGHT REDRESSES THE IRREPARABLE HARM PLAINTIFFS WILL SUFFER ABSENT A TEMPORARY RESTRAINING ORDER

Plaintiffs will face irreparable harm if a temporary restraining order (TRO) is not granted. The primary threat of this harm arises from Defendants' failure to comply with the National Voter Registration Act (NVRA), particularly with respect to the public inspection provision and list maintenance requirements. As the November 5, 2024, federal election rapidly approaches, any

further delay in addressing these violations risks undermining the fundamental right to vote, including vote dilution and improper voter removal—both of which directly compromise the integrity of Pennsylvania's elections. No adequate remedy exists to correct this harm after the election has occurred. Once votes are cast and counted, the damage to voter confidence and the potential dilution of legitimate votes cannot be undone. The requested relief aims to preserve the *status quo*, ensuring that all eligible votes are counted while at the same time, protecting the integrity of the election.

## VIII.   THE PRE-SUIT NOTICE REQUIREMENT IS WAIVED

On October 11, 2024, Defendants denied Plaintiffs October 4, 2024 open records request despite the NVRA making unequivocally clear that "all records" must be made available for public inspection. *See* 52 U.S.C. § 20507(i). Congress explicitly waived any pre-suit notice requirements that impose conditions precedent to lawfully maintaining an action whereas the violation occurs within 30 days of a federal election. Because October 11, 2024 is within thirty (30) days of the November 5, 2024 election, the pre-suit notice requirement has been waived and all conditions precedent have been satisfied to maintain the underlying action.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court issue a temporary restraining order consistent with the terms set forth in the accompanying proposed order, attached hereto.

Dated: October 29, 2024

Respectfully submitted,
1789 FOUNDATION, INC. d/b/a
CITIZEN AG and ANTHONY GOLEMBIEWSKI

By: */s/ Gregory A. Stapp*
Gregory A. Stapp (PA #78247)
153 West Fourth Street, Suite 6

21

Williamsport, PA 17701
Tel: (570) 326-1077
Fax: (570) 651-9420
gstapp@stapplaw.net

By:  /s/ Rachel L. Dreher
Rachel L. Dreher * (FL #32092)
CITIZEN AG
111 NE 1st St, 8th Floor
Miami, FL 33132
Tel: (561) 801-8661
rachel@citizenag.org
*pro hac vice forthcoming

Attorney for Plaintiffs

MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY *EX PARTE* MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2024, a true and correct copy of the foregoing was filed and served via the Court's CM/ECF electronic filing system upon all parties and counsel of record. A copy of this motion and accompanying memorandum of points and authorities will also be served expeditiously upon all Defendants via private process server.

By: _/s/ Gregory A. Stapp_
      Gregory A. Stapp