THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

1789 FOUNDATION, INC. d/b/a        :
CITIZEN AG, *et al.*,               :
                                    :
        Plaintiffs,                 :
                                    :   3:24-CV-1865
        v.                          :   (JUDGE MARIANI)
                                    :
AL SCHMIDT, *et al.*,               :
                                    :
        Defendants.                 :

**FILED
SCRANTON**

NOV 0 4 2024

PER_____
DEPUTY CLERK

<u>**MEMORANDUM OPINION**</u>

**I. INTRODUCTION AND PROCEDURAL HISTORY**

Presently before the Court is Plaintiffs' "Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction" (Doc. 3).

On October 29, 2024, Plaintiffs 1789 Foundation, Inc., d/b/a Citizen AG and Anthony Golembiewski filed a "Verified Complaint and Request for Injunction" (Doc. 1) against Al Schmidt, in his official capacity as Secretary of State, and the Commonwealth of Pennsylvania. Plaintiffs' two-count Complaint asserts: "Violation of the NVRA, 52 U.S.C. § 20507(i)" for "failure to make records available for inspection" (Count 1) and "Violation of the NVRA, 52 U.S.C. § 20501(b), (c), (d)" for "failure to maintain accurate/current voter registration lists" (Count 2)[1].

---

[1] Although Plaintiffs assert violations of "52 U.S.C. § 20501(b), (c), (d)", where § 20501 does not contain a subsection (c) or (d), it appears Plaintiffs are attempting to reference subsections (c) and (d) of 52 U.S.C. § 20507.

That same day, Plaintiffs filed an "Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction" (Doc. 3) and brief in support of the motion (Doc. 4), to which Defendants each filed a brief in opposition (Docs. 17, 18) and Plaintiff filed a Reply (Doc. 19). Plaintiffs' Motion requests the following relief:

1. A court order "enjoin[ing] Defendants from continuing to refuse to make available the records Plaintiffs requested in their October 4, 2024 open records request and compel such records be produced on or before November 2, 2024 in accord with the requirements set forth under 52 U.S.C. § 20507(i)";

2. A court order "enjoin[ing] Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice sent prior to the 2020 General Election; and (2) who did not vote in wither the 2020 or 2022 federal elections, to vote in the 2024 Presidential Election unless the inactive registrant complies with the mandatory applicable provisions of 52 U.S.C. § 20507(e) on or before November 5, 2024".

(Doc. 3, 1-2).

On October 31, 2024, the Court held a conference call with the parties to address Plaintiffs' pending motion. During the conference, an expedited briefing schedule was established and the parties agreed that no evidentiary hearing was necessary to resolve the motion[2].

---

[2] The Third Circuit has "'long ... recognized that a preliminary injunction may issue ... without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue.'" *Schrader v. D.A. of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) (quoting *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982)).

Plaintiffs' motion having been fully briefed, the motion is now ripe for disposition. For the reasons that follow, Plaintiffs' motion for a temporary restraining order and preliminary injunctive relief (Doc. 3) will be denied.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction and temporary restraining order ("TRO").[3]   In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).

When requesting preliminary equitable relief, the movant "must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these two "gateway factors" are met, a court should then consider the other two factors and determine

---

[3] The standard for granting a preliminary injunction under Rule 65 is the same as that for issuing a TRO.  *Pileggi v. Aichele,* 843 F.Supp.2d 584, 592 (E.D. Pa. 2012) (citing *Bieros v. Nicola,* 857 F.Supp. 445, 446 (E.D. Pa. 1994)).

"in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

"District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.' . . . Indeed, '[t]he essence of equity jurisdiction has been the power of the [court] to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Reilly*, 858 F.3d at 178-179 (internal citations omitted).

However, a preliminary injunction will be considered mandatory "if the injunction will either (1) alter the status quo by commanding some positive act or (2) provide the moving party with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Silvertop Assocs., Inc. v. Kangaroo Mfg., Inc.*, 319 F.Supp.3d 754, 761 (D.N.J. 2018) (internal quotation marks omitted), *aff'd*, 931 F.3d 215 (3d Cir. 2019). A party seeking "a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (citing *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir. 1980)). *See also, Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) ("[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction.").

## III. ANALYSIS

Plaintiffs' Complaint alleges violations of the National Voter Registration Act

("NVRA"), 52 U.S.C. § 20501, *et seq.*, including Section 8 of the NVRA (52 U.S.C. § 20507)

which sets forth requirements relating to the administration of voter registration by the

States and instructs that States must implement and maintain procedures to ensure

accurate and current voter registration lists.

As explained by the Third Circuit Court of Appeals,

> The National Voter Registration Act has four main goals: (1) increasing the number of registered voters, (2) increasing participation in federal elections, (3) maintaining current and accurate voter rolls, and (4) ensuring the integrity of the voting process. These goals can sometimes be in tension with one another: On the one hand, maintaining clean voter rolls may help ensure election integrity, but on the other hand, purging voters from the rolls requires voters to re-register and hinders participation in elections. However, it is clear from the legislative history that Congress was wary of the devastating impact purging efforts previously had on the electorate. Congress noted that not only are purging efforts often "highly inefficient and costly" to the state by requiring reprocessing of registrations but also that "there is a long history of such cleaning mechanisms [being] used to violate the basic rights of citizens." The drafters attempted to balance these concerns with the need for clean voter rolls: "An important goal of this bill, to open the registration process, must be balanced with the need to maintain the integrity of the election process by updating the voting rolls on a continual basis."
>
> Accordingly, the NVRA both protects registered voters from improper removal from the rolls and places limited requirements on states to remove ineligible voters from the rolls.

*A.C.L.U. v. Philadelphia City Comm'rs*, 872 F3d 175, 178-179 (3d Cir. 2017) (internal

citations omitted).

As relevant here, Section 8 of the NVRA provides:

In the administration of voter registration for elections for Federal office, each State shall . . .

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except--
(A) at the request of the registrant;
(B) as provided by State law, by reason of criminal conviction or mental incapacity; or
(C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--
(A) the death of the registrant; or
(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) . . .

52 U.S.C. § 20507(a)(3), (4).  Thus, Congress has set forth limited bases for the removal of a registered voter from the list of eligible voters: specifically, the death of a registrant or circumstances in compliance with the requirements of subsections (b), (c), and (d), as set forth below:

Subsection (b), "Confirmation of voter registration", requires that:

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . .

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual--

**(A)** has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then
**(B)** has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

52 U.S.C. § 20507(b)(2).  Subsection (c) of § 20507, "Voter removal programs", provides that:

**(1)** A State may meet the requirement of subsection (a)(4) by establishing a program under which--
**(A)** change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and
**(B)** if it appears from information provided by the Postal Service that--
**(i)** a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or
**(ii)** the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

**(2)(A)** A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters. . . .

52 U.S.C. § 20507(c).  Finally, subsection (d), "Removal of names from voting rolls", dictates that:

**(1)** A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--

**(A)** confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
**(B)(i)** has failed to respond to a notice described in paragraph (2); and
**(ii)** has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

**(2)** A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:
**(A)** If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.
**(B)** If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

**(3)** A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

52 U.S.C. § 20507(d).

Where a registered voter has failed to return the card described in subsection (d), Section 8 sets forth the following procedure:

**(1)** A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election,

8

be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place.

**(2)(A)** A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant--

> **(i)** shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or
> **(ii)(I)** shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or
> **(II)** shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law.

**(B)** If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

**(3)** If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

52 U.S.C. § 20507(e).

Here, Plaintiffs' Complaint alleges several violations of Section 8 by the

Pennsylvania Secretary of State and the Commonwealth of Pennsylvania.  In response to

Plaintiffs' motion for a TRO and preliminary injunctive relief, Defendant Schmidt raises a number of issues, including that Plaintiffs lack standing to bring this action and that Plaintiffs fail to state a claim for relief. (Doc. 17, at 3-16). The Secretary further argues that "there exists no emergent or imminent harm supporting an injunction." (*Id.* at 16-19).[4]

## A. Standing

The Court first addresses Plaintiffs' standing because "[a]bsent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006); *see also Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009). Plaintiffs assert that Mr. Golembiewski has individual standing and Citizen AG has organizational standing. (Doc. 19 at 4-6.) For the reasons that follow, the Court declines to dismiss the case on the basis of standing at this stage of the proceedings.

Article III standing "is a bedrock constitutional requirement." *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) ("*Hippocratic Medicine*") (internal quotation marks omitted). As the Supreme Court explained in *Hippocratic Medicine*,

> standing is "built on a single basic idea—the idea of separation of powers." [*United States v. Texas*, 599 U.S. 670, 675 (2023).] . . .

---

[4] At the Court's direction, the Commonwealth of Pennsylvania also filed a brief in opposition to Plaintiffs' Motion. The Commonwealth argues therein that the Commonwealth has been misjoined, is not an indispensable party to this action, and cannot provide the relief requested in the Plaintiffs' Motion (*see* Doc. 18). Where the Court will deny Plaintiffs' Motion on other grounds, it is unnecessary to evaluate the Commonwealth's arguments at this time. However, while expressing no opinion on the merits, these arguments are appropriately raised in a timely filed Motion to Dismiss.

> Article III of the Constitution confines the jurisdiction of federal courts to "Cases" and "Controversies." The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers. As this Court explained to President George Washington in 1793 in response to his request for a legal opinion, federal courts do not issue advisory opinions about the law—even when requested by the President. 13 Papers of George Washington: Presidential Series 392 (C. Patrick ed. 2007). Nor do federal courts operate as an open forum for citizens "to press general complaints about the way in which government goes about its business." *Allen v. Wright*, 468 U.S. 737, 760, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

602 U.S. at 378-79.

The Court of Appeals for the Third Circuit has observed that "Article III's standing requirement 'is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power.'" *Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 476 (1982). "Invoking the power of the federal judiciary requires more than important issues and able litigants." *Id.* "The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)).

## 1. Individual Standing

It is well settled that a plaintiff must demonstrate three elements to establish constitutional standing: "i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Hippocratic Medicine* (citing *Summers*

*v. Earth Island Institute*, 555 U.S. 488, 493 (2009); *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560–561 (1992)). These three requirements "constitute 'an essential and unchanging

part of the case-or-controversy requirement of Article III.'" *Id.* (quoting *Lujan*, 504 U.S. at

560-61 (1992)).

> *Hippocratic Medicine* generally opined that

>> [f]or a plaintiff to get in the federal courthouse door and obtain a judicial
>> determination of what the governing law is, the plaintiff cannot be a mere
>> bystander, but instead must have a "personal stake" in the dispute. *TransUnion*
>> [*v. Ramirez*, 594 U.S. 413, 423 (2021)]. The requirement that the plaintiff
>> possess a personal stake helps ensure that courts decide litigants' legal rights
>> in specific cases, as Article III requires, and that courts do not opine on legal
>> issues in response to citizens who might "roam the country in search of
>> governmental wrongdoing." *Valley Forge,* 454 U.S. at 487.

602 U.S. at 379. As to "the second and third standing requirements, i.e., causation and

redressability, the Court noted that they "are often 'flip sides of the same coin.'" *Id.* (quoting

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). Thus, "[i]f a

defendant's action causes an injury, enjoining the action or awarding damages for the action

will typically redress that injury. So the two key questions in most standing disputes are

injury in fact and causation." *Id.*

To satisfy the injury-in-fact requirement, a plaintiff must demonstrate that the injury is

"'concrete' meaning that it must be real and not abstract." *Id.* at 381 (citing *TransUnion*, 594

U.S. at 424). "The injury also must be particularized; the injury must affect 'the plaintiff in a

personal and individual way' and not be a generalized grievance."[5] *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). "Moreover, the injury must be actual or imminent, not speculative – meaning that the injury must have already occurred or be likely to occur soon." *Id.* (citing *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)). "[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* (citing *Clapper*, 568 U.S. at 401). Along with these basic principles, *Hippocratic Medicine* set out several relevant considerations:

> By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action. For example, a citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally. *See Valley Forge*, 454 U.S. at 473, 487, 102 S.Ct. 752. A citizen may not sue based only on an "asserted right to have the Government act in accordance with law." *Allen*, 468 U.S. at 754, 104 S.Ct. 3315; *Schlesinger* [*v. Reservists Comm. to Stop the War*, 418 U.S. 208, 225-227 (1974)]. Nor may citizens sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action. *See Valley Forge*, 454 U.S. at 473, 102 S.Ct. 752.
>
> The injury in fact requirement prevents the federal courts from becoming a "vehicle for the vindication of the value interests of concerned bystanders." *Allen*, 468 U.S. at 756, 104 S.Ct. 3315 (quotation marks omitted). An Article III court is not a legislative assembly, a town square, or a faculty lounge. Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law. *See id.* at 754, 104 S.Ct. 3315. Vindicating "the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan*, 504 U.S. at 576, 112 S.Ct. 2130.

---

[5] The Court noted, by way of example, that "[a]n injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights." 602 U.S. at 381 (citing *Clapper*, 568 U.S. at 409).

602 U.S. at 381-82.

Here, Plaintiffs assert that Mr. Golembiewski "will be irreparably harmed as a Pennsylvania voter absent the injunctive relief requested as his fundamental right to vote will be undermined."[6] (Doc. 1, ¶ 104; *see also* Doc. 19, at 6 (quoting Doc. 1, ¶ 104).) The relief sought in conjunction with this claimed harm is Plaintiffs' request that the Court

> grant temporary injunctive relief and enter a temporary restraining order that enjoins Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice sent prior to the 2020 General Election; and (2) did not vote in either the 2020 or 2022 federal elections, to vote in the 2024 Presidential Election **unless the inactive registrant complies with the mandatory applicable provisions of 52 U.S.C. § 20507(e) on or before November 5, 2024**.

(Doc. 1, ¶ 108 (emphasis in original).)

As set out *supra*, 52 U.S.C. § 20507(e) addresses the "Procedure for voting following failure to return card." The relief sought is clearly a request to have state government election officials "act in accordance with law," a request which is not allowed under *Hippocratic Medicine* and *Allen. See* 602 U.S. at 381; 468 U.S. at 754. Thus, as pleaded in Count Two, the Court has grave doubts as to Plaintiff Golembiewski's standing to pursue this action based on *Hippocratic Medicine's* explication of the contours of what constitutes an injury-in-fact for standing purposes. However, the Court will not dismiss this case based

---

[6] Plaintiff Golembiewski is named only in the Second Claim for Relief asserting a violation of the National Voter Registration Act for "Failure to Maintain Accurate/Current Voter Registration Lists." (Doc. 1 at 19.)

on a lack of individual standing at this juncture given the expedited briefing schedule

established at the Court's October 31, 2024, telephone conference and Plaintiffs' request for

a decision on the merits of Plaintiffs' Emergency *Ex Parte* Motion for Temporary Restraining

Order and Preliminary Injunction (Doc. 3) prior to November 5, 2024. Given these

circumstances and in the absence of a motion to dismiss which would afford the parties time

for more thorough briefing of the standing issue, the Court will proceed with a merits

analysis of Plaintiffs' pending Motion.

## 2. Organizational Standing

In their brief in support of their motion and in their Reply brief, Plaintiffs assert that

Citizen AG has organizational standing. (Doc. 4, at 7; Doc. 19, at 4.)  Although the Court

reiterates its grave concerns as to standing, the Court declines to dismiss this case based

on Citizen AG's standing at this juncture for the procedural reasons discussed above.

As explained in *Hippocratic Medicine*, "[u]der this Court's precedents, organizations

may have standing 'to sue on their own behalf for injuries they have sustained.'" *Id.* at 393

(quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). The Court

added that, [i]n doing so, however, organizations must satisfy the usual standards for injury

in fact, causation, and redressability that apply to individuals." *Id.* (citing *Havens*, 455 U.S. at

378-79).

> Like an individual, an organization may not establish standing simply based on
> the "intensity of the litigant's interest" or because of strong opposition to the
> government's conduct, *Valley Forge*, 454 U.S. at 486, 102 S.Ct. 752, "no matter
> how longstanding the interest and no matter how qualified the organization,"

> *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636
> (1972). A plaintiff must show "far more than simply a setback to the
> organization's abstract social interests." *Havens*, 455 U.S. at 379, 102 S.Ct.
> 1114.

*Hippocratic Medicine*, 602 U.S. at 394. Further, "an organization that has not suffered a

concrete injury caused by a defendant's action cannot spend its way into standing simply by

expending money to gather information and advocate against the defendant's action. An

organization cannot manufacture its own standing in that way." *Id.*

Plaintiffs specifically allege the following basis for Citizen AG's organizational

standing:

> It is not subject to reasonable dispute that Citizen AG has sufficiently pled—
> and suffered—actionable harms that establish organizational standing.
> Specifically, the Verified Complaint alleges that Citizen AG "has expended
> substantial resources, including staff time, investigating Defendants' failure to
> comply with their NVRA voter list maintenance obligations, communicating with
> Pennsylvania officials and concerned members about Defendants' failure, and
> researching statements made by Defendants in their correspondence" and
> "[t]he resources expended by Citizen AG to investigate, address, research, and
> counteract Defendants' failure to comply with their NVRA voter list maintenance
> obligations are distinct from and above and beyond Citizen AG's regular,
> programmatic efforts . . .". ECF No. 1 Complt., ¶¶ 61- 62. The Verified
> Complaint also alleges that, "[w]ere it not for Defendants' failure to comply with
> their NVRA voter list maintenance obligations, Citizen AG would have
> expended these same resources on its regular, programmatic activities or
> would not have expended them at all. Instead, it diverted its resources to
> counteract Defendants' noncompliance and to protect members' rights." *Id.* ¶
> 63.
>
> The diversion of resources is unequivocally an allegation that rises above the
> desirous, albeit inexistent, "generalized grievance" Defendants attempt to
> conspicuously attribute to the claims Citizen AG raises. *See, e.g., League of
> Women Voters of Florida, Inc. v. Lee*, 595 F.Supp.3d 1042 (2022) (holding
> voting rights organization had organizational standing because the challenged

provision caused the organization to divert resources from its usual activities); *Mi Familia Vota v. Fontes*, 719 F.Supp.3d 929 (2024) (finding that a nonprofit advocating for its members had both representational and direct organizational standing to challenge Arizona laws that threatened its members with injury and required the organization to divert resources to counteract the effects of the laws); *La Unión del Pueblo Entero v. Abbott*, 614 F.Supp.3d 509 (2022) (finding Plaintiffs had organizational standing because the challenged provisions imposed significant burdens on their members and constituents, forcing the organization to divert resources from other programs to address these new barriers to voting); (emphasis added). *Fair Fight Action, Inc. v. Raffensperger*, 634 F.Supp.3d 1128 (2022), (holding that an organization could establish standing by showing that it had to divert resources from its usual projects to assist voters affected by state action); *Common Cause Indiana v. Lawson*, 937 F.3d 944 (2019) (finding voter-advocacy organizations had standing because they **diverted resources** to counteract the effects of the challenged election laws); *Arcia v. Florida Secretary of State*, 772 F.3d 1335 (2014) (holding the organizational plaintiffs had standing because they had to divert resources to address the Secretary's programs, which constituted a concrete and demonstrable injury. (emphasis added). Accordingly, Citizen AG has pled sufficient facts to establish organizational standing.

(Doc. 19, at 4-5.)

Notably, none of Plaintiffs' supporting citations indicate the jurisdiction in which the case was decided and, upon the Court's citation check, no case was decided by a Court within the Third Circuit. Moreover, Plaintiffs fail to acknowledge *Hippocratic Medicine's* clear directive relevant to the assertion that Citizen AG has suffered a cognizable injury based on the alleged diversion of resources (Doc. 19 at 5). *See* 602 U.S. at 394. The averment that "Citizen AG has expended substantial resources, including staff time, investigating Defendants' failure to comply with their NVRA voter list maintenance obligations, communicating with Pennsylvania officials and concerned members about Defendants' failure, and researching statements made by Defendants in their correspondence" (Doc. 1 ¶

61) on its face does not give rise to a cognizable injury under *Hippocratic Medicine*.
Similarly, based on *Hippocratic Medicine*, this Court has grave doubts that Plaintiff Citizen
AG can establish standing based on the further averment that "[w]ere it not for Defendants'
failure to comply with their NVRA voter list maintenance obligations, Citizen AG would have
expended these same resources on its regular, programmatic activities or would not have
expended them at all. Instead, it diverted its resources to counteract Defendants'
noncompliance and to protect members' rights" (Doc. 1 ¶ 63). However, for the reasons set
forth in the context of individual standing, the Court will proceed with a merits analysis of
Plaintiffs' pending Motion rather than dismiss the case based on a lack of standing at this
early stage of the proceedings.

### B. Plaintiffs' Likelihood of Success on the Merits and the Irreparable Harm to Plaintiffs in the Absence of Injunctive Relief

Even assuming that Plaintiffs have standing to bring one or both counts set forth in
their Complaint, they have failed to demonstrate a likelihood of success on the merits as to
either claim or that they would suffer irreparable harm in the absence of the requested
injunctive relief.

Count 1 of Plaintiffs' Complaint asserts that Defendants have failed to make
requested records available for inspection, in violation of 52 U.S.C. § 20507(i).

Pursuant to § 20507(i), addressing the public disclosure of voter registration
activities:

**(1)** Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

**(2)** The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i).

In support of its claimed violation of § 20507(i), Plaintiffs allege that on or about October 4, 2024, "Citizen AG submitted a public records request to Secretary Schmidt's office pursuant to 52 U.S.C. § 20507(i) and in full compliance with the provisions of the Commonwealth's Right-to-Know Law." (Doc. 1, ¶ 65). Plaintiffs allege that Defendants' response to Citizen AG's request was "due within 5 business days of receiving it, which was October 11, 2024" but that on October 11, 2024, the Secretary of State's office sent an "interim response" informing Plaintiffs that "it needed more time, until November 12, 2024, to send a final response." (Doc. 1, ¶¶ 67-68). (*See also*, Doc. 1, Ex.3 (letter from "Eric" at Citizen AG to Pennsylvania Secretary of State requesting "specific information and records related to your compliance with Section 8 of the National Voter Registration Act and its relevant provisions that require inactive voters who have not voted for two (2) federal election cycles to be removed from your State's voter rolls"); Doc. 1, Ex. 4 (October 11,

2024 letter from Agency Open Records Officer of the Pennsylvania Department of State acknowledging that under the Pennsylvania Right-to-Know-Law ("RTKL") a written response to Citizen AG's request is due by October 11, 2024 but notifying Plaintiff that the "extent and nature of your request precludes a response within the five-day time period" and that pursuant to 65 Pa. P.S. § 67.902, "the Department of State will require up to an additional 30 days, *i.e.* November 12, 2024, in which to provide a final written response to your request")).

       Plaintiffs' Complaint alleges that Secretary Schmidt's "interim response" "constitutes a denial [of Citizen AG's request] because November 12, 2024 is more than 30 days following the five business days allowed for in [65 P.S. § 67.901]".  (Doc. 1, ¶ 68).  Plaintiffs attempt to tie any alleged violation of the Pennsylvania RTKL to a violation of the NVRA by asserting that the "2022 Midterm Election took place on November 8, 2022, and therefore, records regarding the 2022 Midterm Election are less than two (2) years old and Pennsylvania is required to have, at a minimum, records that Citizen AG requested in its October 4, 2024 open records request pertaining to the 2022 Midterm Election in its possession pursuant to 52 U.S.C. § 20507(i)."  (Doc. 1, ¶ 70).  Plaintiffs further contend that the "failure to produce or otherwise make available for inspection the records Citizen AG requested in its October 4, 2024 open records request violates the NVRA's public inspection provision, 52 U.S.C. § 20507(i) that requires Pennsylvania to maintain and make available

for inspection the records Citizen AG requested for a minimum of two years." (Doc. 1, ¶ 79).

Plaintiffs' asserted basis for relief in Count 1 – the Secretary's failure to timely respond to Citizen AG's records request and therefore a violation of subsection 20507(i) of the NVRA – is fundamentally flawed.

Pennsylvania's RTKL requires that

> [u]pon receipt of a written request for access to a record, an agency shall make a good faith effort to determine if the record requested is a public record, legislative record or financial record and whether the agency has possession, custody or control of the identified record, and to respond as promptly as possible under the circumstances existing at the time of the request. All applicable fees shall be paid in order to receive access to the record requested. The time for response shall not exceed five business days from the date the written request is received by the open-records officer for an agency. If the agency fails to send the response within five business days of receipt of the written request for access, the written request for access shall be deemed denied.

65 P.S. § 67.902(b). If, upon receipt of a written request for access, an open-records officer determines that one or more circumstances exist which may require an excess of five business days to respond, the "open-records officer shall send written notice to the requester within five business days of receipt of the request for access" and:

> (2) The notice shall include a statement notifying the requester that the request for access is being reviewed, the reason for the review, a reasonable date that a response is expected to be provided and an estimate of applicable fees owed when the record becomes available. If the date that a response is expected to be provided is in excess of 30 days, following the five business days allowed for in section 901, the request for access shall be deemed denied unless the requester has agreed in writing to an extension to the date specified in the notice.

> (3) If the requester agrees to the extension, the request shall be deemed denied on the day following the date specified in the notice if the agency has not provided a response by that date.

65 P.S. § 67.902(b).

Here, Plaintiffs' Complaint alleges that the request for records was sent on October 4, 2024, and that, pursuant to the five-business day rule, a response was due on or before October 11, 2024. Plaintiffs acknowledge the applicability of the permissible 30-day extension of time available to the Secretary of State, but nonetheless, without explanation in the Complaint or brief in support of the request for emergency injunctive relief, assert that the Secretary's response stating that the documents will be provided on or before November 12, 2024, "is more than 30 days following the five business days allowed for in [65 P.S. § 67.901]". (Doc. 1, ¶ 68). A simple review of a calendar establishes Plaintiffs' mistaken calculations. The parties do not dispute that the Secretary's response was first due by October 11, 2024. Thirty days from this date is November 10, 2024, a Sunday. November 11, 2024, a Monday, is Veterans' Day, a federal holiday. Thus, Pennsylvania's statutory text provides that November 12, 2024, is the proper date on which the Secretary's response is due. *See* 1 Pa. C.S. § 1908 ("When any period of time is referred to in any statute, such period in all cases . . . shall be so computed as to exclude the first and include the last day of such period. Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation."). Where the Secretary

22

properly calculated the time period in which it had to respond to Citizen AG's records

request, and that time has not yet elapsed, Plaintiff is incorrect that Citizen AG's request

can be "deemed denied". Further, both on the conference call held on October 31, 2024,

with the parties, and in the Secretary's brief in opposition to Plaintiffs' motion for injunctive

relief, the Secretary has represented that he intends to fully comply with the RTKL and

timely respond to Plaintiffs' records request. (*See* Doc. 17, at 4 n.1).

In their Reply brief, Plaintiffs argue that they "are not suing for a state law claim" but

instead that their claim "arises pursuant to 52 U.S.C. § 20507(i)(1)" which requires States,

including Pennsylvania, to "maintain 'all records' . . . which by definition includes the records

Plaintiff requested in its October 4, 2024 request." (Doc. 19, at 2-3). Critically, in

determining whether Plaintiffs are entitled to injunctive relief at this time, Plaintiffs do not

explain, absent the application of Pennsylvania state law, when they believe they would

have been otherwise entitled to these records. Plaintiffs further attempt to argue that, even

if the Court were to impose Defendant's "strict adherence standard" of the RTKL, the Court

should deem the records request denied because Defendants did not comply with §

67.902(b)(2)'s requirement that the Secretary's notice "shall" also include "an estimate of

applicable fees owed when the record becomes available". (Doc. 19, at 2-4). This

argument fails where the Pennsylvania Commonwealth Court has expressly held when

addressing the requirements of § 67.902(b) that "a fee estimate does not need to be

included in the first response, sent within five business days, to a requester", *Pa. Dep't of*

*Educ. v. Bagwell*, 131 A.3d 638, 652-653 (Pa. Commw. Ct. 2015).  *See also, id.* at 652 n. 10 ("Although we hold the word 'shall' is not mandatory as to including an estimate of fees in the initial response, the provision may be read as mandating the notice to include three elements: (1) notice of the review; (2) the reason for the review; and, (3) a reasonable future date that a response *and* an estimate of fees is expected to be provided. In other words, the notice would contain the future response date, at which time *both* the substantive response and the estimate of fees would be provided.").

For these reasons, Plaintiffs have failed to demonstrate a likelihood of success on the merits of Count 1.  Plaintiffs have not set forth any viable assertion, argument, or evidence, that the Secretary of State has not timely complied, or will not timely comply, with the open-records request that Citizen AG submitted on October 4, 2024 or that they have been improperly denied any records by the Pennsylvania Secretary of State.

For purposes of the preliminary injunction analysis, Plaintiffs have also not demonstrated that they will suffer irreparable harm without the injunctive relief that they seek.  As related to Count 1, Plaintiffs request a court order "enjoin[ing] Defendants from continuing to refuse to make available the records Plaintiffs requested in their October 4, 2024 open records request and compel such records be produced on or before November 2, 2024 in accord with the requirements set forth under 52 U.S.C. § 20507(i)" (Doc. 3). Here, as addressed *supra*, the Defendants have not "refuse[d] to make available the records Plaintiffs request[ed]".  The Secretary of State represents that it will respond to the

records request on or before November 12, 2024, in accordance with its legal obligations.

Although the Court recognizes that the federal Election will be held on November 5, 2024,

Plaintiffs have not set forth any reason why they require the records prior to that day.

Further, the Court notes that, despite Plaintiffs' characterization of this request as

generally seeking preliminary injunctive relief, Plaintiffs are, in fact, attempting to obtain

mandatory injunctive relief.  Plaintiffs' request that this Court order the Secretary to

immediately turn over the requested records commands a positive act and would provide

Plaintiffs with "substantially all the relief sought" in Count 1, *Silvertop Assocs., Inc.*, 319

F.Supp.3d at 761.  Where this Court has determined that Plaintiffs are not entitled to a

preliminary injunction under the standard burden, it is evident that they are unable to meet

the "particularly heavy burden in demonstrating its necessity" required to obtain a

mandatory injunction, *Acierno*, 40 F.3d at 653.

Plaintiffs have also not demonstrated a likelihood of success on the merits on Count

2 or that they would suffer irreparable harm if their request for injunctive relief is denied.

Count 2 of Plaintiffs' Complaint asserts violations of the NVRA, and specifically

"failure to maintain accurate/current voter registration lists" (Doc. 1, at 19).  Citing to the

provisions of Section 8, Plaintiffs rely on the 2020 and 2022 Election Administration and

Voting Survey ("EAVS") reports (Doc. 1, Ex. 1 & 2) to assert a calculation that "277,768

registrants remain inactive despite there being no basis for these registrants to not have been removed or reactivated." (Doc. 1, at 19-23; *id.* at ¶ 98).[7]

Preliminarily, the assertion that there exists 277,768 registrants at issue is without proper foundation and is purely speculative. As noted by the Secretary,

> Plaintiffs assert that 753,942 registered voters were sent confirmation notices prior to the 2020 General Election. . . But the numbers that Plaintiffs cite do not reflect "individuals" or "voters." Rather, as clearly identified in the report that Plaintiffs cite "[t]he number reported in A8a includes initial notices sent to voters who appear to have moved based upon information received pursuant to the National Change of Address program." 2022 EAVS at 187 (emphasis added).
>
> Pennsylvania counties often send more than one notice to the same voter: an initial confirmation notice based on information from the U.S. Postal Service National Change of Address list and, if there is no response or the response comes back as undeliverable, an additional address verification notice. 25 Pa.C.S. § 1901; 4 Pa. Code § 183.6. Thus, the 753,942 figure includes multiple notices sent to the same voters.
>
> Plaintiffs compound this error by presuming that Pennsylvania's list maintenance activities, as expressed in the EAVS report, are static. They are not. Instead, voter statuses are constantly changing, and under the NVRA, must constantly change. For example, an inactive voter could be reactivated by voting or otherwise confirming their status with the county election board. An inactive voter could re-register after having been cancelled for failure to vote in two consecutive federal elections pursuant to 25 U.S.C. § 20507(d). See also 25 Pa.C.S. § 1901(d). An inactive voter could die. The number of inactive voters will never be a static figure- it changes every day, and the EAVS report referenced by Plaintiffs is a mere "snapshot" in time.

---

[7] Relying on the EAVS, Plaintiffs' simplistic explanation in their Complaint for arriving at their conclusion with respect to the existence of 277,768 registrants who should have been removed from the voter rolls is as follows: According to the 2020 EAVS, Pennsylvania sent 753,942 confirmation notices to registered Pennsylvania voters prior to 2020 General Election and 116,042 registrants responded. Therefore 637,900 registrants who were sent the notices did not respond. According to the 2022 EAVS, 360,132 registrants were removed after November 8, 2022 election for failing to respond to notices. Therefore, according to Plaintiffs, 277,768 registrants should have been removed after the November 8, 2022 election.

(Doc. 17, at 14-15). In their Reply brief, Plaintiffs "concede that, if the information provided by Defendant is true and that the 277,768 includes multiple notices to the same voter, that the number of inactive voters could possibly be less than 277,768" but argue that nonetheless "the number of inactive voters is undetermined and greater than zero" and they have thus set forth a cause of action.  (Doc. 19, at 7).

Plaintiffs fail to explain how evidence of "greater than zero" inactive voters provides them with a basis for their claim, nor do they explain how the number of inactive voters relates to their claim that Pennsylvania has failed to maintain accurate/current voter registration lists where the requested relief in Count 2 is that the Court:

> grant temporary injunctive relief and enter a temporary restraining order that enjoins Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice sent prior to the 2020 General Election; and (2) did not vote in either the 2020 or 2022 federal elections, to vote in the 2024 Presidential Election **unless the inactive registrant complies with the mandatory applicable provisions of 52 U.S.C. § 20507(e) on or before November 5, 2024**.

(Doc. 1, ¶ 108 (emphasis in original).)  As previously quoted in the context of standing, *supra*, "[a] citizen may not sue based only on an 'asserted right to have the Government act in accordance with law.'"  *Hippocratic Medicine*, 602 U.S. at 381-82 (quoting *Allen*, 468 U.S. at 754).[8]  Here, the Plaintiffs have not alleged that Pennsylvania has not followed §

---

[8] Even assuming that one or more individuals may be potentially ineligible to vote on the basis that they were not removed from the voter registration rolls, but will nonetheless vote, as the Ninth Circuit recently explained, "whether evaluated in the context of [standing] or on the merits, . . . the mere fact that some invalid ballots have been inadvertently counted, without more, does not suffice to show a distinct

20507(e), or will fail to do so, both prior to, and on the day of, the Election on November 5, 2024.

Furthermore, Plaintiffs have not demonstrated that they will suffer irreparable harm without the injunctive relief that they seek.  Here, Plaintiffs' Motion for a TRO and preliminary injunctive relief requests a court order "enjoin[ing] Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice sent prior to the 2020 General Election; and (2) who did not vote in wither the 2020 or 2022 federal elections, to vote in the 2024 Presidential Election unless the inactive registrant complies with the mandatory applicable provisions of 52 U.S.C. § 20507(e) on or before November 5, 2024" (Doc. 3).  Otherwise stated, Plaintiffs request that this Court order Pennsylvania to comply with the law, without setting forth any basis for a belief that the Commonwealth will not comply with the governing federal and state law.  Plaintiffs' Motion further explains that they "are not seeking the removal of any voters, including those who were required to be removed as of November 9, 2022, pursuant to 52 U.S.C. § 20507(d)(1)(B); instead, and in the interest of all Pennsylvanian voters, Plaintiffs merely request that this Court enforce the provisions of 52 U.S.C. § 20507(e) as a means of balancing the interests of all registered Pennsylvania voters."  (Doc. 3, at 2 n.1).  Plaintiffs do not explain how their request for injunctive relief would prevent any harm where they have not presented any evidence by

---

harm to any group of voters over any other." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1089 n.13 (9th Cir. 2024).

affidavit or otherwise, or allegations sufficient to form a basis to believe, that the Commonwealth will not comply with the relevant law and thus that there will be any resultant harm to Plaintiffs.

For these reasons, Plaintiffs have failed to demonstrate a likelihood of success on the merits of Count 2 or that they will suffer irreparable harm if their request for preliminary injunctive relief is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs have not met their burden with respect to any entitlement to preliminary injunctive relief or a TRO. Plaintiffs have not demonstrated that they have a likelihood of success on the merits with respect to any of their claims and that they are more likely than not to suffer irreparable harm in the absence of preliminary injunctive relief.[9] Plaintiff's "Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction" (Doc. 3) will therefore be denied. A separate order follows.

Robert D. Mariani
United States District Judge

---

[9] Because Plaintiffs have failed to demonstrate irreparable harm or likelihood of success on the merits, "the Court need not address the last two factors in the preliminary injunction analysis." *Asian-Am. Licensed Beverage Assoc. v. Commw. of Pennsylvania*, 2005 WL 3077246, at *7 (M.D. Pa. 2005) (citing *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000)). *See also*, *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).