THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

1789 FOUNDATION, INC. d/b/a            :
CITIZEN AG, *et al.*,                  :
                                       :
        Plaintiffs,                    :
                                       :  3:24-CV-1865
        v.                             :  (JUDGE MARIANI)
                                       :
AL SCHMIDT, in his official capacity   :
as Secretary of State, *et al.*,       :
                                       :            FILED
        Defendants.                    :           SCRANTON
                                       :
AFT PENNSYLVANIA, and the              :           MAY 0 2 2025
PENNSYLVANIA ALLIANCE FOR              :        PER_____
RETIRED AMERICANS,                     :            DEPUTY CLERK
                                       :
        Intervenor-Defendants.         :


<u>**MEMORANDUM OPINION**</u>

Presently before the Court is Defendant Al Schmidt, in his official capacity as

Secretary of State for the Commonwealth of Pennsylvania, and Intervenor-Defendants AFT

Pennsylvania and Pennsylvania Alliance for Retired Americans' motions to dismiss. (Docs.

49, 50). Specifically, both Defendant Schmidt and Intervenor-Defendants claim that

Plaintiffs lack Article III standing to pursue the claims alleged in Count I and Count II brought

under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq* (the "NVRA"). For the

reason that follow, the Court agrees, and the motions to dismiss will be granted, with leave

to amend.

## I.    INTRODUCTION & PROCEDURAL HISTORY

One week before the 2024 Federal General Election, Plaintiffs 1789 Foundation, Inc., d/b/a Citizen AG ("Citizen AG") and Anthony Golembiewski ("Golembiewski") filed a "Verified Complaint and Request for Injunction," (Doc. 1), against Al Schmidt, in his official capacity as Secretary of State, and the Commonwealth of Pennsylvania.  Plaintiffs' two-count Complaint asserts: "Violation of the NVRA, 52 U.S.C. § 20507(i)" for "failure to make records available for inspection," ("Count I"), and "Violation of the NVRA, 52 U.S.C. § 20501(b), (c), (d)" for "failure to maintain accurate/current voter registration lists" ("Count II").[1]

That same day—October 29, 2024—Plaintiffs filed an "Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction," (Doc. 3), and brief in support of the motion, (Doc. 4), to which Defendants each filed a brief in opposition, (Docs. 17, 18), and Plaintiff filed a Reply, (Doc. 19).  Plaintiffs' Motion requested the following relief:

1. A court order "enjoin[ing] Defendants from continuing to refuse to make available the records Plaintiffs requested in their October 4, 2024 open records request and compel such records be produced on or before November 2, 2024 in accord with the requirements set forth under 52 U.S.C. § 20507(i)";

2. A court order "enjoin[ing] Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice sent prior to the 2020 General Election; and (2) who did not vote in wither the 2020 or 2022 federal elections, to vote in the 2024 Presidential Election unless the inactive registrant complies

---

[1]    Although Plaintiffs asserted violations of "52 U.S.C. § 20501(b), (c), (d)", where § 20501 does not contain a subsection (c) or (d), it appears Plaintiffs are attempting to reference subsections (c) and (d) of 52 U.S.C. § 20507.

with the mandatory applicable provisions of 52 U.S.C. § 20507(e) on or before November 5, 2024".

(Doc. 3, 1-2).

On October 31, 2024, the Court held a conference call with the parties to address Plaintiffs' pending motion. During the conference, an expedited briefing schedule was established and the parties agreed that no evidentiary hearing was necessary to resolve the motion.[2] On November 4, 2024—the day before the 2024 Federal Election—the Court issued a Memorandum Opinion & Order denying Plaintiffs' motion for a temporary restraining order and preliminary injunction. (Docs. 20-21).

On November 7, 2024, AFT Pennsylvania and the Pennsylvania Alliance for Retired Americans ("Intervenor-Defendants") filed a motion to intervene and brief in support. (Docs. 22-23). On December 11, 2024, the Court granted Intervenor-Defendants' motion as unopposed.[3] (Doc. 36). Thereafter, Plaintiffs filed a motion to supplement their Complaint, (Doc. 40), which the Court granted on January 15, 2025. (Doc. 45). On January 22, 2025, Plaintiffs filed their Supplemental Complaint. (Doc. 46).

---

[2]    The Third Circuit has "'long ... recognized that a preliminary injunction may issue ... without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue.'" *Schrader v. D.A. of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) (quoting *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982)).

[3]    More specifically, pursuant to M.D. Pa. Local Rule 7.6, "[a]ny party opposing any motion . . . shall file a brief in opposition within fourteen (14) days after service of the movant's brief" and "any party who fails to comply with this rule shall be deemed not to oppose such motion." Neither Plaintiffs nor the Commonwealth filed any brief in opposition to the intervention motion, and Defendant Schmidt concurred in Intervenor-Defendants' motion. Accordingly, the Court granted the intervention motion as unopposed. (Doc. 36).

On February 5, 2025, three separate motions to dismiss were filed by Defendants Commonwealth of Pennsylvania, Secretary of State Al Schmidt, and Intervenor-Defendants. (Docs. 49-51).  Plaintiffs oppose these motions.  (Docs. 56-57).  On March 6, 2025, Plaintiffs filed a Notice of Voluntary Dismissal against the Commonwealth of Pennsylvania only.  (Doc. 58).  That same day, the Court issued an order dismissing Defendant Commonwealth of Pennsylvania from this action, without prejudice.  (Doc. 59).  The motions to dismiss have been fully briefed and are ripe for disposition.

## II.    THE SUPPLEMENTAL COMPLAINT

Plaintiffs' Supplement Complaint, (Doc. 46), alleges the following:

### A. Nature of Action

"This lawsuit seeks to enforce the public inspection and list maintenance provisions of the NVRA requiring Pennsylvania to maintain accurate voter registration lists by removing ineligible voters based on residency changes."  (Doc. 46 at 1).  "Under the NVRA, voter removal is mandated when:  (1) a registrant provides written confirmation of a move, or (2) a registrant fails to respond to a confirmation notice and does not vote in the next two federal elections.  52 U.S.C. § 20507."  (*Id.* at 1-2).

The NVRA "provides registrants who fail to respond to confirmation notices significant protections against pre-mature or improper removal; the most notable of which is its statutory waiting period that gives registrants who don't respond multiple years to multiple minutes' worth of action—action that, once taken by the registrant, frees any worry

4

of removal." (*Id.* at 2). "Of course, there must be some means of delineating voters who respond to their confirmation notices and those who do not. For that reason, those who do not respond to confirmation notices are referred to as 'inactive' registrants." (*Id.*). The term inactive "does not mean the registrant is not eligible to vote or otherwise prohibited from voting—in fact, all inactive registrants are registered voters. An 'inactive' registration status is merely a demarcation attributed to registrants who do not respond to confirmation notices that remain in place during the multiple years the registrant has to take the simple action of confirming his or her residence by either (A) notifying their registrar, which the registrant can do both in person or even in writing; or (B) by simply voting in one of the next two federal elections." (*Id.*).

"The NVRA, however, is also cognizant of the need to protect the fundamental right to vote held by active registered votes, too. For that reason, registrants who have not responded to their confirmation notice and then do not vote in either of the next two federal elections (i.e., the statutory waiting period) must be removed from the voter rolls. 52 U.S.C. § 20507(b)(2)(B)." (*Id.*). "According to the statistics Pennsylvania's Secretary of State reported to the Election Assistance Commission, there are at least 277,768 inactive registrants who were sent confirmation notices prior to the 2020 General Election via forwarded mail who did not respond, and at least 2 federal elections have since elapsed— yet all 277,768 of 277,768 names remain registered to vote in the November 5, 2024 federal election." (*Id.* at 3). "Upon learning this on or about October 3, 2024, Citizen AG

5

immediately submitted an open-records request on October 4, 2024 and pursuant to the

NVRA public inspection provision and Pennsylvania state law, requesting to inspect or

receive copies of records reflecting how many of the subject 277,768 voters had cast a

ballot in the 2020 General Election or the 2022 Midterm Election." (*Id.*).

"On October 11, 2024, Secretary Schmidt's office sent an 'interim response' stating

that the Commonwealth would require an additional thirty (30) days to comply with Citizen

AG's request and provided an expected response date of November 12, 2024." (*Id.*). "On

November 12, 2024, Defendant Schmidt's office advised that Citizen AG's request 'is

granted and enclosed is a record responsive to your request.'" (*Id.*). "But despite granting

the request, Secretary Schmidt has failed to produce responsive data or information to all of

the inquiries Citizen AG requested." (*Id.*). "More specifically, Secretary Schmidt's

responsive production omitted the number of voters who responded to their confirmation

notices by informing the Secretary of State that their address was valid (i.e, the voter still

lives at their registered voting address and therefore, should have their status reactivated)."

(*Id.* at 3-4). "This variable is important because a response without indication as to whether

the response advised the voter still resided at the address at which they are registered to

vote results in the reactivation of the voter, while a response indicating that the address was

invalid would result in the immediate removal of the voter." (*Id.* at 4).

"In addition to the failure to produce all responsive information requested by Citizen

AG, Secretary Schmidt's response contains inconsistences and a material, irrefutable

admission that Defendants have violated the NVRA's list maintenance provision." (*Id.*). "Item No. 8 on Citizen AG's October 4, 2024 record requests ask Secretary Schmidt to make available for public inspection or otherwise produce the following:  Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice, did not vote on November 3, 2020, did not vote on November 8, 2022, and have not been removed from Pennsylvania's voter rolls as of present." (*Id.*).  "In response thereto, Secretary Schmidt admits that at least 77,188 registered Pennsylvania voters meet the aforesaid criteria above." (*Id.*).  "The information requested in Item No. 8 is definitionally the standard and criteria the NVRA sets forth that requires the Commonwealth to remove any voter defined therein, and as shown above, **Secretary Schmidt has admitted that at least 77,188 registrants were not removed on or before the November 5, 2024 federal election**." (*Id.* at 4-5) (emphasis in original).

"Plaintiffs now file this supplemental complaint to redress Defendants' failure to timely produce responsive records, data, or information Citizen AG's lawful request sought—all of which records are required to be maintained and made available pursuant to the NVRA's public inspection provision, 52 U.S.C. § 20507(i)." (*Id.* at 5).  "This action also is to protect the fundamental right to vote for all Pennsylvanians and to ensure no eligible voter's fundamental right to vote is undermined because of vote dilution caused by Defendants' failure to maintain accurate voter rolls." (*Id.*).  "Absent the relief requested

7

herein, there is no way to enforce the NVRA's mandatory list maintenance provision as to, at a minimum, the 77,188 voters Secretary Schmidt has admittedly failed to remove in violation of 52 U.S.C. § 20507(b)(2)(B)." (*Id.*). "Citizen AG and its Pennsylvania members have legitimate concerns about the fundamental right to vote being undermined, and when state officials blatantly ignore and violate their duties under well-established federal law, judicial intervention is the only means left to ensuring we maintain the integrity of our electoral process." (*Id.*).

## B. The Parties

Plaintiffs 1789 Foundation, Inc. d/b/a/ Citizen AG is a nonprofit organization organized under the laws of the State of Florida "dedicated to educating American [sic] about their rights and advocating, protecting, and preserving American civil liberties and constitutional rights through an array of means that includes without limitation, engaging in litigation." (Doc. 46 at ¶ 4). "Citizen AG, through its associational standing established by its Pennsylvania members, and co-Plaintiff Anthony Golembiewski seek declaratory relief pursuant to 52 U.S.C. § 20510(b)(1), which authorizes a private citizen to bring this suit to enforce the NVRA, and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202." (*Id.*). Plaintiff Golembiewski is an adult resident of Pennsylvania, a Citizen AG member, and an active registered voter of Allegheny County "whose fundamental right to vote was undermined directly and proximately because of Defendants' noncompliance with the NVRA." (*Id.* at ¶ 5).

The "Defendant Commonwealth of Pennsylvania is covered by the requirements of the NVRA with respect to elections for Federal office." (*Id.* at ¶ 6). Defendant Al Schmidt is the Secretary of State for the Commonwealth of Pennsylvania. (*Id.* at ¶ 7). Section 10 of the NVRA requires that "[e]ach State shall designate a State officer of employee as the chief State election official to be responsible for coordination of State responsibilities under this Act. 52 U.S.C. § 20509." (*Id.*). Pennsylvania law establishes that the Secretary of State is "the chief state election officer for the purposes of the National Voter Registration Act of 1993. 25 Pa. Stat. § 2621(a)." (*Id.*). Secretary Schmidt is being sued in his official capacity. (*Id.*).

According to the Plaintiffs, "[t]he allegations raised herein pertain to one or more violations of the NVRA that occurred within thirty (30) days of a federal election, including without limitation, Defendant's spectacularly cavalier failure to maintain accurate voter rolls; so much so that tens of thousands of ineligible voters remained registered as 'inactive' more than two (2) years after their removal was compelled, including at a time and throughout the entirety of a Presidential election. As such, since the violations occurred within thirty (30) days of a federal election, any notice-related conditions precedent to maintaining this action are waived entirely pursuant to 52 U.S.C.§ 20510(b)(3)." (*Id.* at ¶ 3).

## C. Statutory Background

Section 8 of the NVRA provides "each State shall ... conduct a general program that *makes a reasonable effort* to remove ... from the official lists of eligible voters" the names

of voters who have become ineligible by reason of . . . a change of residence.  52 U.S.C. §

20507(a)(4).  (Doc. 46 at ¶ 8) (emphasis added).  With respect to voters who have changed

residence, Section 8 provides that no registration may be cancelled on that ground unless

the registrant either (1) confirms this fact in writing, or (2) fails to timely response to an

address confirmation notice described by the statute (the "Confirmation Notice").  52 U.S.C.

§ 20507(d)(1)(B).  (Doc. 46 at ¶ 9).  A Confirmation Notice is a "postage prepaid and

preaddressed return card, sent by forwardable mail," that asks the registrant to confirm his

or her residence address.  (*Id.* at ¶ 10).  "If a registrant fails to response to a Confirmation

Notice, and then fails to vote (or contact the registrar) during a statutory waiting period

extending from the date of the notice through the next two general federal elections, the

registration is cancelled."  (*Id.* at ¶ 11).  "These cancellations are mandatory under federal

law."  (*Id.*).  "A voter's registration status is referred to as "inactive" during the statutory

waiting period, which runs from the notice mailing until the day following the second

consecutive federal election that occurs thereafter."  (*Id.* at ¶ 12).  A voter with an inactive

registration may still vote even on election day of the second federal election, so long as he

or she complies with the requirements set forth under 52 U.S.C. § 20507(d)(2)(A).  (*Id.* at ¶

13).  Accordingly, inactive voters are still registered voters.  (*Id.*).

     In June of each odd-numbered year, the U.S. Election Assistance Commission

("EAC") is required by law to report to Congress its finding relating to state voter registration

practices.  52 U.S.C. § 20508(a)(3).  (Doc. 46 at ¶ 14).  Federal regulations require states to

provide various kinds of NVRA-related data to the EAC for use it in its biennial report.  11

C.F.R. § 9428.7.  (Doc. 46 at ¶ 15).  Section 8(i) of the NVRA grants the public the right to

request information concerning voter list maintenance and provides in pertinent part:

> Each State shall maintain for at least 2 years and shall make available for public inspection and copying all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

(*Id.* at ¶ 16).  Though not purporting to be an exhaustive list, Section 8(i)(2) provides specific

examples of responsive records:  "The records maintained . . . shall include lists of the

names and addresses of all persons to whom notices described in subsection (d)(2) are

sent, and information concerning whether or not each such person has responded to the

notice as of the date that inspection of the record is made.  52 U.S.C. § 20507(i)(2)."  (Doc.

46 at ¶ 17).

The NVRA provides that "[e]ach State shall designate a State officer or employee as

the chief State election official to be responsible for coordination of State responsibilities

under this chapter."  (*Id.* at ¶ 18).  Pennsylvania law designates the Secretary of State as

this official.  (*Id.*).  The NVRA affords a private right of action to any "person who is

aggrieved by violation of the Act.  52 U.S.C. § 20510(b)."  (Doc. 46 at ¶ 19).  Ordinarily, a

private litigant is required to send notice of a violation to the chief State election official 90

days prior to commencing a lawsuit.  (*Id.*).  However, "[i]f the violation occurred within 30

days before the date of an election for Federal office, the aggrieved person need not

provide notice to the chief election official of the State . . . before bringing a civil action ... 52

U.S.C. § 20510(b)(3)." (Doc. 46 at ¶ 19). According to Plaintiffs, "[b]ecause Defendants violated the NVRA within thirty (30) days of a federal election, as more fully explained below, the notice requirement is waived entirely [sic]." (*Id.* at ¶ 20).

D. <u>Background of the NVRA</u>

As alleged by Plaintiffs, the NVRA has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls. (*Id.* at ¶ 21). To achieve the latter goal, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names" of voters who are ineligible 'by reason of' *inter alia* a change in residence. 52 U.S.C. § 20507(a)(4)." (Doc. 46 at ¶ 22). The NVRA contains two (2) express requirements that must be met before a State removes a name from its voter rolls based on a change-of-residence grounds. (*Id.* at ¶ 23). These requirements exist to protect the fundamental right to vote held by those who otherwise could potentially be removed improperly. (*Id.*). On the other hand, "Congress was also cognizant of the importance of ensuring eligible voters' fundamental rights to vote is also protected against vote dilution." (*Id.* at ¶ 24). "For that reason, the NVRA makes it mandatory that the States remove voters, based on change-of-residence grounds, when these two requirements are met." (*Id.*).

The first and most important of the two requirements is a prior notice obligation. (*Id.* at ¶ 25). Before the NVRA, some States removed registrants without giving any notice. (*Id.*). "But this is no longer an issue because the NVRA limits States and only permits the

removal of a registrant's name from the rolls based upon change-of-residence grounds to situations when (A) the registrant confirms in writing that he or she has moved; or (B) the registrant fails to return the preaddressed, postage prepaid return card that is included with the confirmation notices sent by the States via forwarded mail to registrants the State suspects may have moved out of the district in which they are registered." (*Id.*).  These return cards provide the explicit instructions as to what a registrant who receives a Confirmation Notice but has not moved must do in order to remain on the voter rolls:  the voter must either return the card confirming his or her residence or vote in at least one of the next two general federal elections.  52 U.S.C. § 20507(d)(2)(A).  (Doc. 46 at ¶ 26).  For the benefit of those who have moved, the return card also contains "information concerning how the registration can continue to be eligible to vote.  52 U.S.C. § 20507(d)(2)(B)."  (Doc. 46 at ¶ 27).

"These safeguards protect against the improper removal of a registered voter on change-of-residence grounds; however, the fundamental right to vote must also be protected for those who remain actively registered, too." (*Id.* at ¶ 28).  "To accomplish this, the NVRA makes mandatory the removal of all voters who (A) fails to return the card confirming his or her residence and (B) do not vote in at least one of the next two general federal elections." (*Id.*).  "The removal of voters who do not return the card confirming his or her residence and do not vote in either of the next two federal elections is mandatory." (*Id.* at ¶ 29).

### E.  The Election Administration Commission's EAVS Reports

The U.S. EAC "is an independent federal agency dedicated to improving the administration of elections across the country." (*Id.* at ¶ 30).  Since 2004, the EAC has furthered its objectives by conducting the Election Administration and Voting Survey ("EAVS") following each federal general election.  (*Id.* at ¶ 31).  The EAVS asks Pennsylvania and the remaining 49 U.S. states, as well as five U.S. territories—American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands—to provide data about the ways Americans vote and how elections are administered.  (*Id.* at ¶ 32).  The EAVS is sent to the chief election officials of the states, which here, is Secretary Schmidt, who then provides responses to the survey's questions that cover various aspects of Pennsylvania election administration.  (*Id.* at ¶ 33).

The EAVS survey responses Pennsylvania's Secretary of State provided for both the 2020 and the 2022 EAVS Reports include, without limitation, the following information:

a.  How many confirmation notices the Commonwealth sent via forwarded mail;

b.  How many voters responded to the notices and whether the response indicates that a voter has or has not moved;

c.  The number of confirmation notices that were returned undeliverable;

d.  How many voters are listed as active/inactive;

e.  The number of registrants the Commonwealth removed from its voter rolls;

f.  The reason for removal; and

g.  How many voters were removed for each respective reason.

(*Id.* at ¶ 34).  "These reports and Defendant's Schmidt's November 12, 2024 response to Item No. 8 on Citizen's AG's October 4, 2024 open record request, provide the relevant information needed to determine whether Pennsylvania has complied with its federal obligations concerning list maintenance obligations."  (*Id.* at ¶ 35).

In reviewing, Defendants' responses to the 2020 EAVS Report, Pennsylvania sent 753,942 registered voters confirmation notices (inclusive of return cards) via forwarded mail prior to the 2020 General Election.  (*Id.* at ¶ 36).  "Of the 753,942 confirmation notices sent to registered Pennsylvania voters, only 116,042 registrants responded."  (*Id.* at ¶ 37). "Based on these figures, a minimum of 637,900 registrants were sent confirmation notices via forwarded mail and did not respond, resulting in their registration statues being switched to 'inactive' prior to the 2020 General Election."  (*Id.* at ¶ 38).

"After the 2022 Midterm Election, Pennsylvania reported to the EAC that it removed 360,132 registrants of the 637,900 registrants who did not respond to the confirmation notices sent to them by the Commonwealth via forwarded mail."  (*Id.* at ¶ 39).  "When taking the 637,900 registrants who did not respond to their conformation notices before the 2020 General Election and subtracting the 360,132 registrants that Secretary Schmidt reported the Commonwealth removed after the next two (2) federal elections, there remains a total of 277,768 registered voters on Pennsylvania's voters rolls as of the filing date."  (*Id.* at ¶ 40). "Due to the fact that it is statistically improbable, if not impossible, that 277,768 out of

277,768 inactive registrants reactivated their registration status in compliance with 52

U.S.C. § 20507(e), and in light of the threat posed by inactive registrants remaining on the

voter rolls Congress sought to eradicate with the enactment of the NVRA, Citizen AG

submitted sought records to determine how many of the 277,768 inactive registrants

reactivated their registration status by voting in the 2020 or 2022 Midterm Elections."  (*Id.* at

¶ 41).

**F.  Plaintiff's Open Records Request Pursuant to 52 U.S.C. § 50207(i)**

On October 4, 2024, "Citizen AG submitted an open records request seeking

records, documents, and/or information Defendants are required to maintain and make

available for public inspection upon request pursuant to the NVRA's public inspection

provision." (*Id.* at ¶ 42).  In particular, Citizen AG's records request sought records

concerning the voter history of the 277,768 inactive registrants to determine how many of

these registrants voted in the 2020 General Election or 2022 Midterm Election.  (*Id.* at ¶ 43).

"Specifically, Citizen AG's request sought records that would evidence how many of the

subject 277,768 inactive registrants voted in either the 2020 and/or 2022 federal elections,

as such registrants should have had their voter registration statuses reactivated and all

other inactive registrants should have been removed as they had met the requisite standard

that compels removal under the NVRA (i.e., not responding to a confirmation notice and

failing to vote in the next 2 consecutive federal elections)."[4]  (*Id.* at ¶ 44).  "The remaining

registrants (all who are presently still registered as inactive), while any of the 277,768

inactive registrants who did not vote in 2020 or 2022 were required to have been removed

as of November 9, 2022—the date following the second consecutive federal election and

the first day following the expiration of the statutory waiting period."  (*Id.* at ¶ 45).

Among other items, Citizen AG specifically requested that Secretary Schmidt provide

the following:

> Records and/or data that reflect the total number of voters who were sent confirmation
> notices between November 7, 2018 and November 3, 2020 who did not respond to
> the notice, did not vote on November 3, 2020, did not vote on November 8, 2022, and
> have not been removed from Pennsylvania's voter rolls as of present.

(*Id.* at ¶ 46).  More specifically, the requested documents and information, which are

attached to Plaintiffs' Supplemental Complaint, (Doc. 46-1), were sent as follows:

Pennsylvania Secretary of State
401 North Street, Rm 206
Harrisburg, PA 17120

Dear Secretary of State,

I am writing to request specific information and records related to your compliance with
Section 8 of the National Voter Registration Act and its relevant provisions that require
inactive voters who have not voted for two (2) federal election cycles to be removed from
your State's voter rolls.

As such, I specifically request the following:

---

[4]    According to Plaintiffs, "[t]hese removals should have begun on November 9, 2022—the date
following the second consecutive federal election."  (Doc. 46 at ¶ 44 n.6).

1. Records and/or data reflecting the total number of confirmation notices sent to Pennsylvania voters from November 7, 2018 through November 3, 2020;

2. Records and/or data that reflect the total number of responses to the aforesaid notices you or the State of Pennsylvania received confirming the recipient is an eligible voter;

3. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice;

4. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice but voted on November 3, 2020;

5. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice and did not vote on November 3, 2020, but did vote on November 8, 2022.

6. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020, who did not respond to the notice, did not vote on November 3, 2020 and did not vote on November 8, 2022.

7. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice, did not vote on November 3, 2020, did not vote on November 8, 2022, and have been removed from Pennsylvania's voter rolls at any time from November 9, 2022 through present.

8. Records and/or data that reflect the total number of voters who were sent confirmation notices between November 7, 2018 and November 3, 2020 who did not respond to the notice, did not vote on November 3, 2020, did not vote on November 8, 2022, and have been not been [sic] removed from Pennsylvania's voter rolls as of present.

I would appreciate it if this information could be provided in a digital format, if available. Thank you for your time and attention to this matter. I look forward to your prompt response.

Sincerely,

Eric
eric@citizenag.org

(Doc. 46-1).   Although the letter is undated, it is understood that this document was sent to

Defendant Schmidt on October 4, 2024.  Moreover, as the plain language of the letter

states, and as alleged in the Supplemental Complaint, only Citizen AG, not Mr.

Golembiewski, sought disclosure from Defendant Schmidt.

"On November 12, 2024, Secretary Schmidt responded to Citizen AG's October 4,

records request.  In doing so, Secretary Schmidt made an admission that the

Commonwealth had not removed at least 77,188 registrants who, as of November 9, 2022,

were ineligible to vote absent re-registering him or herself." (Doc. 46 at ¶ 47).  Specifically,

Secretary Schmidt "has now admitted" 77,188 registered Pennsylvania voters:

a. Were sent confirmation notices between November 7, 2018 and November 3,
   2020;

b. Did not respond to the confirmation notices;

c. Did not vote in the November 3, 2020 federal election;

d. Did not vote in the November 8, 2022 federal election; and

e. Have not been removed from the voter rolls.

(*Id.* at ¶ 48).  Secretary Schmidt is and was at all times relevant required to produce the

information concerning voter history and removals pursuant to Citizen AG's request.  (*Id.* at

¶ 49).  "Defendants violated the NVRA by denying failing [sic] to remove ineligible voters for

a period of nearly two entire years, including each day of the 30 days leading up to the November 5, 2024 election." (*Id.* at ¶ 50).

### G. Plaintiff's Interest

Plaintiff Citizen AG's "mission is to educate Americans about their rights and preserve our civil rights and liberties in the courts. The organization fulfills its mission through public records requests and litigation, among other means." (*Id.* at ¶ 51). Citizen AG is supported in its mission by tens of thousands of individuals across the nation. (*Id.* at ¶ 52). An individual becomes a member of Citizen AG by making a financial contribution, in any amount, to the organization. (*Id.*). Members' financial contributions are by far the single most important source of income to Citizen AG and provide the means by which the organization finances its activities to support its mission. (*Id.*). Citizen AG, in turn, represents the interests of its members. (*Id.*). "Over the past several years, Citizen AG's members have becomes increasingly concerned about the state of the nation's voter registration rolls, including whether state and local officials are complying with the NVRA's voter list maintenance obligations." (*Id.* at ¶ 53). "They are concerned that failing to comply with the NVRA's voter list maintenance obligations impair the integrity of elections by increasing the opportunity for ineligible voters or voters intent on fraud to cast ballots." (*Id.*).

"Defendants' failure to comply with their NVRA voter list maintenance obligations burden the federal and state constitutional rights to vote of all individual members of Citizen AG who are lawfully registered to vote in Pennsylvania by undermining their confidence in

the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified and diluted." (*Id.* at ¶ 54).  "Protecting the voting rights of Citizen AG members who are lawfully registered to vote in Pennsylvania is germane to Citizen AG's mission."  (*Id.* at ¶ 55).  "It also is well within the scope of the reasons why members of Citizen AG join the organization and support its mission."  (*Id.*).  "Because the relief sought herein will inure to the benefit of Citizen AG members who are lawfully registered to vote in Pennsylvania, neither the claims asserted, nor the relief requested requires the participation of Citizen AG's individual members."  (*Id.* at ¶ 56).

"In response to the concerns of its members, Citizen AG commenced a nationwide program to monitor state and local election officials' compliance with their NVRA list maintenance obligations."  (*Id.* at ¶ 57).  "As part of this program, Citizen AG utilizes public records law to request and receive records and data from jurisdictions across the nation about their voter list maintenance efforts."  (*Id.*).  "It then analyzes these records and data and publishes the result of its finding to the jurisdiction, to its members, and to the general public."  (*Id.*).  "Citizen AG's concerns with Pennsylvania's list maintenance practices led it to send the October 2024 correspondence described in this complaint and to request documents relating to the state's list maintenance practices, and to analyze the Commonwealth's responses."  (*Id.* at ¶ 58).  "Citizen AG's concerns also led it to conduct analyses of Pennsylvania's registration rates, removal rates, Confirmation Notice statistics,

and inactive rates." (*Id.* at ¶ 59). Citizen AG "has expended substantial resources, including staff time, investigating Defendants' failure to comply with the NVRA voter list maintenance obligations, communicating with Pennsylvania officials and concerned members about Defendants' failures, and researching statements made by Defendants in their correspondence." (*Id.* at ¶ 60). "The resources expended by Citizen AG to investigate, address, research, and counteract Defendants' failure to comply with their NVRA voter list maintenance obligations are distinct from and above and beyond Citizen AG's regular, programmatic efforts to monitor state and local election officials' NVRA compliance." (*Id.* at ¶ 61). "Were it not for Defendants' failure to comply with their NVRA voter list maintenance obligations, Citizen AG would have expended these same resources on its regular, programmatic activities or would not have expended them at all. Instead, it diverted its resources to counteract Defendants' noncompliance and to protect members' rights." (*Id.* at ¶ 62).

## H. First Claim for Relief – Violation of the NVRA, 52 U.S.C. § 20507(i), Failure to Make Records Available for Inspection.

Citizen AG incorporates by reference all preceding paragraphs as is fully set forth herein. (*Id.* at ¶ 63). "On or about October 4, 2024, Citizen AG submitted a public records request to Secretary Schmidt's office pursuant to 52 U.S.C. § 20507(i) and in full compliance with the provisions of the Commonwealth's Right-to-Know Law." (*Id.* at ¶ 64). "Citizen AG's request sought records or information sought records [sic] concerning voter history and information as to the number of the subject 277,768 inactive registrants who

reactivated their registration statuses by voting in the 2020 or 2022 federal elections. (*Id.* at ¶ 65). Defendants' response to Citizen AG's request was due within 5 business days of receiving it, which was October 11, 2024. (*Id.* at ¶ 66). On October 11, 2024, the Secretary of State's office sent an "interim response" stating that it needed more time, until November 12, 2024, to send a final response. (*Id.* at ¶ 67).

On November 12, 2024, Secretary Schmidt issued a response, stating that Citizen AG's October 4, 2024 records request was granted. (*Id.* at ¶ 68). Accompanying the response letter was a single-page datasheet that provided some—but not all—of the information sought by Citizen AG in its October 4 records request. (*Id.*). Specifically, Item No. 2 in Citizen AG's request asked for the following: "Records and/or data that reflect the total number of responses to the aforesaid notices you or the State of Pennsylvania received confirming the recipient is an eligible voter." (*Id.* at ¶ 69). No response to this request was included, and the deadline to response under Pennsylvania's Right-to-Know Law "has since expired." (*Id.* at ¶ 70). "Under 65 Pa. Stat. § 67.902, this constitutes a denial because November 12, 2024 is more than 30 days following the five business days allowed for in section 901."[5] (*Id.* at ¶ 71).

Section 8(i) of the NVRA requires that Defendants retain and make available for public inspection, for at least two years, all records concerning voter list maintenance

---

[5] The Court previously rejected this argument still advanced by Plaintiffs. (Doc. 20 at 21-22) ("A simple review of a calendar establishes Plaintiffs' mistaken calculations. . . .").

activities, such as removals, confirmations of voter eligibility, and updates to voter

registration lists, as well as any records regarding the implementation of programs and

activities conducted to ensure the accuracy and currency of official lists of eligible voters.

(*Id.* at ¶ 72). "The 2022 Midterm Elections took place on November 8, 2022, and therefore,

records regarding the 2022 Midterm Election are less than two (2) years old and

Pennsylvania is required to have, at a minimum, records that Citizen AG requested in its

October 4, 2024 open records request pertaining to the 2022 Midterm Election in its

possession pursuant to 52 U.S.C. § 20507(i)." (*Id.* at ¶ 73). Citizen AG's request sought

records from the 2022 Midterm Election, including the number of persons who voted in the

2022 Midterm Election even though they had previously received and failed to respond to a

confirmation notice prior to the 2020 General Election. (*Id.* at ¶ 74). "The NVRA's public

inspection provision is a floor, not a ceiling, insofar as Pennsylvania is required to maintain

records for at least two years; there is no prohibition concerning Pennsylvania's

maintenance of records responsive to Citizen AG's request for more than two (2) years, and

thus, Pennsylvania could—and should—have records regarding the 2020 General Election

that are responsive to Citizen AG's October 4 open records request." (*Id.* at ¶ 75).

"The NVRA compels states to remove inactive registrants based on change-of-

residence grounds when the inactive registrant fails to respond to a confirmation notice and

thereafter does not vote in either of the next two consecutive federal elections." (*Id.* at ¶

76). "There are a minimum of 277,768 inactive registrants who were subject to removal as

of November 9, 2022 that remain registered to vote in Pennsylvania." (*Id.* at ¶ 77).

"Pennsylvania's data also contains inconsistences that make it impossible to ascertain true

and accurate voter-related numbers." (*Id.* at ¶ 78). Any registrant who (1) did not respond

to their confirmation notice sent prior to the 2020 federal election; and (2) did not vote in the

2020 federal election; and (3) did not vote in the 2022 federal election was required to have

been removed from the voter rolls. (*Id.* at ¶ 79). "Alternatively, any registrant who (1) did

not respond to their confirmation notices sent prior to the 2020 federal election; but (2) did

vote in either (or both) the 2020 federal election and/or 2022 federal election; and (3) did not

vote in the 2022 federal election was required to have been removed from the voter rolls."

(*Id.* at ¶ 80). "All 277,768 inactive registrants failed to respond to confirmation notices that

were sent via forwarded mail prior to the 2020 General Election." (*Id.* at ¶ 81).

   "In light of the NVRA's two-federal-election provision governing removals,

Pennsylvania is also required to maintain records, including voter history records, for a

minimum of four (4) years; otherwise, failing to maintain such records would preclude

Pennsylvania from ever complying with 52 U.S.C. § 20507(d)(1)(B) as it applies to

mandatory removals based on change-of-residence grounds." (*Id.* at ¶ 82). "Removals or

voter registration cancellations based on change-of-residence grounds are mandatory under

both federal and Pennsylvania law." (*Id.* at ¶ 83). "No exception exists that otherwise would

exempt this information and these records from the public inspection provisions of the

NVRA." (*Id.* at ¶ 84). "The failure to produce or otherwise make available for inspection all

records Citizen AG requested in its October 4, 2024 open records request violates the

NVRA's public inspection provision, 52 U.S.C. § 20507(i) that requires Pennsylvania to

maintain and make available for inspection the records Citizen AG requested for a minimum

of two years." (*Id.* at ¶ 85). "Citizen AG's October 4, 2024 records request sought records

that were less than two years old, but Defendants denied Citizen's AG request on October

11, 2024." (*Id.* at ¶ 86). "The two-year records maintenance requirement is a floor, not a

ceiling." (*Id.* at ¶ 87). "In order to comply with the list maintenance obligations, the

Commonwealth must maintain at a minimum the records regarding voter removals as a

result of their failure to respond to confirmation notices for a period of no less than two

federal elections (e.g., 4 years)." (*Id.*). "Otherwise, compliance with this obligation would

necessarily be impossible." (*Id.*). "In reviewing the partially responsive information

Defendants produced on November 12, 2024, the number do not add up." (*Id.* at ¶ 88).

"For example, of the 277,768 voters who did not respond to their confirmation notices that

were sent prior to the 2020 election:  (a) 134,744 registrants voted in 2020; (b) 10,912

registrants voted in 2022; and (c) 297,380 registrants did not vote in 2020 or 2022." (*Id.*).

"Of the 297,380 inactive registrants that Defendants themselves admit did not

respond to a confirmation notice or vote in either the 2020 or 2022 federal elections,

Defendants also admit that just 132,575 registrants were removed, and 77,188 registrants

were not removed." (*Id.* at ¶ 89). "But this only accounts for 209,763 inactive registrants of

the 297,380 inactive registrants in dispute." (*Id.*).  There is no indication as to whether the

remaining 87,617 inactive registrants are still registered but inactive; registered as an active

voter, or whether the Commonwealth actually removed these voters. (*Id.*). "Had the

Commonwealth provided specific information that was true, accurate, and correct to each of

the eight (8) enumerated items listed in Citizen AG's October 4 request. This discrepancy

would not exist if the Commonwealth adhered to the NVRA's mandates concerning public

records inspection and voter list maintenance." (*Id.* at ¶ 90). "As a direct and proximate

result of Defendants' acts and/or omissions and failures complained of herein, Citizen AG

has expended substantial resources, including staff time, investigating Defendants' failure to

comply with the NVRA voter list maintenance obligations, communicating with Pennsylvania

officials and concerned members about Defendants' failure, and researching statements

made by Defendants in their correspondence." (*Id.* at ¶ 91).

　　　"The resources expended by Citizen AG to investigate, address, research and

counteract Defendants' failure to comply with their NVRA voter list maintenance obligations

are distinct from and above and beyond Citizen AG's regular, programmatic efforts to

monitor state and local election officials' NVRA compliance." (*Id.* at ¶ 92). "Were it not for

Defendants' failure to comply with their NVRA voter list maintenance obligations, Citizen AG

would have expended the same resources on its regular, programmatic activities or would

not have expended them at all." (*Id.* at ¶ 93). "Instead, Citizen AG diverted its resources to

counteract Defendants' noncompliance and to protect members' rights." (*Id.*). "Citizen AG

has been deprived of the opportunity to inspect and review records concerning voter list

maintenance, which is critical towards its mission and frustrates its purpose of preserving constitutional rights and civil liberties, including those of its member such as Mr. Golembiewski, who himself in directly injured as a registered and eligible voter of the Commonwealth of Pennsylvania." (*Id.* at ¶ 94). "Defendants' failure to comply with the NVRA public inspection provision has caused the aforesaid injuries and harm to Plaintiffs, and Defendants will continue to refuse to comply with the NVRA resulting in more injury to Citizen AG and Mr. Golembiewski absent the injunctive relief requested herein."[6] (*Id.* at ¶ 95).

## I.    Second Claim for Relief – Violation of the NVRA, 52 U.S.C. §§ 20501(b),(c),(d), Failure to Maintain Accurate/Current Voter Registration Lists.

Plaintiffs incorporate by reference all preceding paragraphs as is fully set forth herein. (*Id.* at ¶ 97). "Section 8 of the NVRA makes mandatory and imposes a non-discretionary duty upon Defendants to establish a removal-from registration program that 'makes a reasonable effort' to remove voters who become ineligible for reasons that include, without limitation, change-of-residence grounds." (*Id.* at ¶ 98). At all times relevant, it is Defendants' obligation to "ensure that accurate and current voter registration

---

[6]    As discussed, the Court denied Plaintiffs' motions for an *ex parte* temporary restraining order and preliminary injunction on November 4, 2024. (Doc. 21). Nevertheless, Plaintiffs in their Supplemental Complaint filed January 22, 2025, inexplicably "ask this Court to issue an emergency ex parte temporary restraining order prohibiting Defendants from further violating 52 U.S.C. § 20507(i) and compel Defendants to provide public access to the records Citizen AG requested on October 4, by November 2, 2024." (Doc. 46 at ¶ 96).

rolls are maintained. 52 U.S.C. §§ 20501(b)(3), (4)." (*Id.* at ¶ 99). Subsection (d) of the

NVRA is the provision that governs removals based on the ground that the registrant has

changed residence. (*Id.* at ¶ 100). Under subsection (d) of the NVRA, a registrant

becomes ineligible on change-of-residence grounds if the registrant "(i) has failed to

respond to a notice" and "(ii) has not voted or appeared to vote . . . during the period

beginning on the date of the notice and ending on the day after the date of the second

general election for Federal office that occurs after the date of the notice. 52 U.S.C. §

20507(d)(1)(B)." (*Id.* at ¶ 101). "A registrant's failure to respond to a notice and failure to

vote in either of the next two subsequent elections is evidence of a registrant's ineligibility

based upon change-of-residence grounds." (*Id.* at ¶ 102).

Defendants sent 753,942 registered voters confirmation notices, inclusive of return

cards, via forwarded mail prior to the 2020 General Election. (*Id.* at ¶ 103). A total of

116,042 of 753,942 registrants responded to the confirmation notices. (*Id.* at ¶ 104). Of the

remaining 637,900 registrants who were sent confirmation notices via forwarded mail and

did not respond, Secretary Schmidt reported removing just 360,132 of 637,900 registrants—

less than 50%—after the next 2 consecutive federal elections had elapsed and the statutory

waiting period concluded. (*Id.* at ¶ 105). As of November 9, 2022, each of the 277,768

inactive registrants who did not respond to confirmation notices that were sent before the

2020 General Election, but did vote in 2020 or 2022 should have had their registration

statuses switched to active. (*Id.* at ¶ 106). As of November 9, 2022, each of the 277,768

inactive registrants who did not respond to confirmation notices that were sent before the

2020 General Election and did not vote in either 2020 or 2022 should have been removed

due to  52 U.S.C. § 20507(b)(2)(B)'s requirement to "remove an individual from the official

list of eligible voters if the individual . . . has not voted or appeared to vote in 2 or more

consecutive general elections for Federal office." (*Id.* at ¶ 107).

As of the date of this filing, 100% of the 277,768 inactive registrants at issue in this

case should be listed as active voters or entirely removed from the rolls. (*Id.* at ¶ 108).

"Despite this, 277,768 registrants remain inactive despite there being no basis for these

registrants to not have been removed or reactivated." (*Id.* at ¶ 109).  "Of the 277,768 voters

whose registration and/or registration status are at issue, Secretary Schmidt has admitted

that Pennsylvania failed to remove 77,188 of the aforesaid voters in violation of the NVRA's

mandatory list maintenance provisions." (*Id.* at ¶ 110).  "In addition to the 77,188 inactive

registrants who become ineligible on November 9, 2022—the day following the conclusion

of the second federal election that had elapsed after receiving and failing to respond to a

confirmation notice—Secretary Schmidt's responses contain inconsistencies and omissions,

including those as described above in paragraphs 87-91." (*Id.* at ¶ 111).

"As a direct and proximate result of Defendants' failure to comply with the NVRA's

list maintenance provisions, 52 U.S.C. § 20507(d)(1)(B), Citizen AG has expended

substantial resources, including staff time, investigating Defendants' failure to comply with

their NVRA voter list maintenance obligations, communicating with Pennsylvania officials

and concerned members about Defendants' failure, and researching statements made by Defendants in their correspondence." (*Id.* at ¶ 112). "The resources expended by Citizen AG to investigate, address, research, and counteract Defendants' failure to comply with their NVRA voter list maintenance obligations are distinct from and above and beyond Citizen's AG's regular, programmatic efforts to monitor state and local election officials' NVRA compliance." (*Id.* at ¶ 113). "Were it not for Defendants' failure to comply with their NVRA voter list maintenance obligations, Citizen AG would have expended these same resources on its regular, programmatic activities or would not have expended them at all." (*Id.* at ¶ 114). Instead, it diverted its resources to counteract Defendants' noncompliance and to protect members' rights. (*Id.*).

Citizen AG on its own and on behalf of its members, including Pennsylvania registered voter Anthony Golembiewski, have been deprived of the opportunity to inspect and review records concerning voter list maintenance, which is critical to ensuring transparency and accountability in the administration of Pennsylvania's voter rolls. (*Id.* at ¶ 115). As a direct and proximate result of Defendants' failure to comply with the NVRA's list maintenance requirement provision, 52 U.S.C. § 20507(d)(1)(B), Mr. Golembiewski will be irreparably harmed as a Pennsylvania voter absent the injunctive relief requested as his fundamental right to vote will be undermined. (*Id.* at ¶ 116). "The Supreme Court enacted the NVRA's list maintenance provisions pursuant to the constitutionally protected and

fundamental right to vote, which includes *inter alia* protections against vote dilution." (*Id.* at ¶ 117).

"Plaintiffs have no other option than to seek the emergency ex parte relief requested in the accompanying motion for emergency ex parte temporary restraining order and preliminary injunction and supporting memorandum of law and points and authorities filed contemporaneously with this action."[7] (*Id.* at ¶ 118). "Defendants' failure to comply with the NVRA's public inspection provision has caused harm and absent emergency ex parte injunctive relief requested herein, Plaintiffs will continue to be harmed irreparably." (*Id.* at ¶ 119). Thus, "Plaintiffs respectfully request that this Court enjoin Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice sent prior to the 2020 General Election; and (2) did not voter in either of the 2020 or 2022 federal elections, to remain registered to vote when federal law compels their removal, especially after now what has been three federal elections." (*Id.* at ¶ 120).

## J.  Plaintiffs' Prayer for Relief

In their Supplemental Complaint Plaintiffs ask the Court to grant the following prayer for relief:

(A)  Enter an order declaring that Defendants' refusal to remove from its voter rolls prior to the 2024 General Election the 77,188 registrants who become ineligible

---

[7]    As discussed, the Court denied Plaintiffs' motions for an *ex parte* temporary restraining order and preliminary injunction on November 4, 2024.  (Doc. 21). Although Plaintiffs have filed a Supplemental Complaint on January 22, 2025, they did not file a new motion for a temporary restraining order or preliminary injunction.

voters on November 9, 2022, constitutes a violation of the NVRA's list maintenance provisions, 52 U.S.C. § 20507(e);

(B)  Issue a Permanent Injunction that enjoins Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice; and (2) who did not vote in either of the next two consecutive federal elections, to remain listed on the Commonwealth's voter rolls;

(C)  Enter an order declaring that Defendants have violated 52 U.S.C. § 20507(d)(1)(B) by failing to remove inactive voters who received confirmation notices and did not respond, and therefore, did not vote in the next two consecutive federal elections, yet still remain registered to vote;

(D)  Issue an order compelling Defendants to affirmatively administer an adequate general program of list maintenance in compliance with the requirements of Section 8 of the NVRA in elections; and

(E)  Grants any further relief that is deemed just and proper, including attorney's fees and costs incurred in bringing this action.

(Doc. 46 at 30-31).

By way of comparison, in their initial Complaint, Plaintiffs requested the following relief:

(A)  Issue an order granting emergency *ex parte* temporary restraining relief that enjoins Defendant from continuing to violate the NVRA's public inspection provision

and compels Defendants to produce the records responsive to Plaintiffs' October 4, 2024 open records request as required pursuant to 52 U.S.C. § 20507(i);

(B)  Enter an order declaring that Defendants' October 11, 2024 denial of Citizen AG's records request constitute a violation of the NVRA's public inspection provision, 52 U.S.C. § 20507(i);

(C)  Issue a Temporary Restraining Order that enjoins Defendants from allowing any inactive registrant that (1) failed to respond to a confirmation notice; and (2) who did not vote in either of the next two consecutive federal elections, to vote in the 2024 Presidential Election unless the inactive registrant complies with the mandatory applicable provisions of 52 U.S.C. § 20507(e) on or before November 5, 2024;

(D)  Enter an order declaring that Defendants have violated 52 U.S.C. § 20507(d)(1)(B) by failing to remove inactive voters who received confirmation notices and did not respond, and therefore, did not vote in the next two consecutive federal elections, yet still remain registered to vote;

(E)  Issue an order compelling Defendants to affirmatively administer an adequate general program of list maintenance in compliance with the requirements of Section 8 of the NVRA in elections;

(F)  Grants any further relief that is deemed just and proper, including attorney's fees and costs incurred in bringing this action.

(Doc. 1 at 23-24).

### III.    STANDARD OF REVIEW

#### A. Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (internal citations omitted).

> [T]he federal courts are without power to adjudicate the substantive claims in a lawsuit, absent a firm bedrock of jurisdiction. When the foundation of federal authority is, in a particular instance, open to question, it is incumbent upon the courts to resolve such doubts, one way or the other, before proceeding to a disposition of the merits.

*Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir. 1977). "[T]he burden of establishing the [existence of subject-matter jurisdiction] rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted). Since the federal courts' jurisdiction is strictly limited by Constitution and statute, "[i]t is to be presumed that a cause lies outside this limited jurisdiction." *Id.*

A motion to dismiss for lack of subject-matter jurisdiction is properly made under Federal Rule of Civil Procedure 12(b)(1). "A district court has to first determine, however, whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).

> A facial attack, as the adjective indicates, is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present. Such an attack can occur before the moving party has filed an answer or otherwise contested the factual allegations of the complaint. A factual attack, on the other hand, is an argument that there is no subject matter jurisdiction because the facts of the case – and here the District Court may look beyond the pleadings to ascertain the facts – do not support the asserted jurisdiction.

*Id.* at 358.

When a party files a motion attacking jurisdiction prior to filing an answer to the complaint or otherwise presenting competing facts, the motion is "by definition, a facial attack." *Aichele*, 757 F.3d at 358. Where, as here, the Defendant presents a facial attack on the court's subject matter jurisdiction, "we treat the allegations of the complaint as true and afford the plaintiff the favorable inferences to be drawn from the complaint." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001).

## B. Federal Rule of Civil Procedure 12(b)(6)

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting

*Iqbal,* 556 U.S. 679).

## IV.    ANALYSIS

### A.  The National Voter Registration Act

Plaintiffs' initial and Supplemental Complaint alleges violations of the NVRA,

specifically Section 8 of the NVRA (52 U.S.C. § 20507) which sets forth requirements

relating to the administration of voter registration by the States and instructs that States

must implement and maintain reasonable procedures to ensure accurate and current voter

registration lists.[8]  As explained by the Third Circuit Court of Appeals:

> The National Voter Registration Act has four main goals: (1) increasing the
> number of registered voters, (2) increasing participation in federal elections, (3)
> maintaining current and accurate voter rolls, and (4) ensuring the integrity of
> the voting process.  These goals can sometimes be in tension with one another:
> On the one hand, maintaining clean voter rolls may help ensure election
> integrity, but on the other hand, purging voters from the rolls requires voters to
> re-register and hinders participation in elections. However, it is clear from the
> legislative history that Congress was wary of the devastating impact purging
> efforts previously had on the electorate. Congress noted that not only are
> purging efforts often "highly inefficient and costly" to the state by requiring

---

[8]    Because Plaintiffs filed a Supplemental Complaint, the Court must assess Plaintiffs' Article III
standing at the time the Supplemental Complaint was filed.  *See Lutter v. JNESO,* 86 F.4th 111, 125-26 (3d
Cir. 2023) ("But, if a district court permits a supplemental complaint, then for the claims and requested relief
substantively affected by the alleged post-suit developments, a plaintiff's Article III standing is evaluated as
of the date of the supplemental pleading.").  Accordingly, the Court will assess Plaintiffs Article III standing
as of the date of the filing of the Supplemental Complaint—January 22, 2025.  Moreover, as Intervenor-
Defendants correctly point out, both the initial Complaint, (Doc. 1), and Supplemental Complaint, (Doc. 46),
are before the Court.  (Doc. 61 at 8 n.1).  Pursuant to Federal Rule of Civil Procedure 15(d), Plaintiffs'
supplemental complaint "does not replace [the] extant pleading, but instead supplements that pleading."
*Victor v. Varano*, No. 3:11-CV-891, 2012 WL 2367095, at *6 (M.D. Pa. June 21, 2012).  Accordingly,
Intervenor-Defendants requests that "if the Court grants either motion to dismiss here, it should dismiss the
Complaint and the Supplemental Complaint, both of which remain operative as pleadings." (Doc. 61 at 8
n.1).

reprocessing of registrations but also that "there is a long history of such cleaning mechanisms [being] used to violate the basic rights of citizens." The drafters attempted to balance these concerns with the need for clean voter rolls: "An important goal of this bill, to open the registration process, must be balanced with the need to maintain the integrity of the election process by updating the voting rolls on a continual basis."

Accordingly, the NVRA both protects registered voters from improper removal from the rolls and places limited requirements on states to remove ineligible voters from the rolls.

*Am. Civil Rights Union. v. Philadelphia City Comm'rs*, 872 F3d 175, 178-179 (3d Cir. 2017) (internal citations omitted). "In short, once a person is properly registered to vote, a state is only permitted to remove him or her from the voting list for narrowly specified reasons. Specifically, Congress allows removal if: the person dies, changes residences, ask to be taken off the list, or becomes ineligible under state law because of criminal conviction or mental incapacity." *Id.* at 179. "As its text makes clear, NVRA was intended as a shield to protect the right to vote, not as a sword to pierce it." *Id.* at 182.

As relevant here, Section 8 of the NVRA provides:

In the administration of voter registration for elections for Federal office, each State shall . . .

**(3)** provide that the name of a registrant may not be removed from the official list of eligible voters except--
**(A)** at the request of the registrant;
**(B)** as provided by State law, by reason of criminal conviction or mental incapacity; or
**(C)** as provided under paragraph (4);

**(4)** conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--

**(A)** the death of the registrant; or
**(B)** a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) . . .

52 U.S.C. § 20507(a)(3), (4). Thus, Congress has set forth limited bases for the removal of

a registered voter from the list of eligible voters: specifically, the death of a registrant or

circumstances in compliance with the requirements of subsections (b), (c), and (d), as set

forth below:

Subsection (b), "Confirmation of voter registration", requires that:

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . .

**(2)** shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual--
**(A)** has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then
**(B)** has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

52 U.S.C. § 20507(b)(2). Subsection (c) of § 20507, "Voter removal programs", provides

that:

**(1)** A State may meet the requirement of subsection (a)(4) by establishing a program under which--
**(A)** change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and
**(B)** if it appears from information provided by the Postal Service that--

**(i)** a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

**(ii)** the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

**(2)(A)** A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters. . . .

52 U.S.C. § 20507(c). Finally, subsection (d), "Removal of names from voting rolls",

dictates that:

**(1)** A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--

**(A)** confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

**(B)(i)** has failed to respond to a notice described in paragraph (2); and

**(ii)** has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

**(2)** A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

**(A)** If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is

permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

**(B)** If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

**(3)** A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

52 U.S.C. § 20507(d).

Where a registered voter has failed to return the card described in subsection (d),

subsection (e) sets forth the following procedure:

**(1)** A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place.

**(2)(A)** A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant--

**(i)** shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

**(ii)(I)** shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by

the registrant of the new address on a standard form provided by the registrar at the central location; or

**(II)** shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law.

**(B)** If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

**(3)** If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

52 U.S.C. § 20507(e).

In addition, the NVRA contains a section concerning public disclosure. Pursuant to § 20507(i), addressing the public disclosure of voter registration activities:

**(1)** Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

**(2)** The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i).

The NVRA also contains a statutory cause of action governing private parties like

Plaintiffs.  Specifically:

(b) Private Right of action—

    1.     A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

    2.     If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

    3.     If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

52 U.S.C. § 20510.

The NVRA "has two main objectives:  increasing voter registration and removing

ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph*

*Institute*, 584 U.S. 756, 761, 138 S.Ct. 1833, 201 L.Ed.2d 141 (2018) (citing 52 U.S.C. §

20501(b)).  "To achieve the latter goal, the NVRA requires States to 'conduct a general

program that makes a reasonable effort to remove the names' of voters who are ineligible

'by reason of' death or change in residence." *Id.* (citing 52 U.S.C. § 20507(a)(4)).  The

NVRA "also prescribes requirements that a State must meet in order to remove a name on

change-of-residence grounds."  *Id.* at 761-62 (citing 52 U.S.C. § 20507(b), (c), (d)).

## B. **Article III Standing - Count II**

The Court will begin its analysis with Count II of the initial and Supplemental Complaint.  Count II of Plaintiffs' Complaint asserts violations of the NVRA, and specifically "failure to maintain accurate/current voter registration lists."  (Doc. 1 at 19).  Citing to the provisions of Section 8, Plaintiffs rely on the 2020 and 2022 Election Administration and Voting Survey ("EAVS") reports, (Doc. 1, Ex. 1 & 2), to assert a calculation that "277,768 registrants remain inactive despite there being no basis for these registrants to not have been removed or reactivated."  (Doc. 1 at 19-23; *id.* at ¶ 98).[9]  In their Supplemental Complaint Plaintiffs raise a similar, yet distinct claim.  Relying on both the 2020 and 2022 EAVS reports again, as well as the disclosure provided by Defendant Schmidt, Plaintiffs now allege that 77,188 registrants remain on Pennsylvania's voter rolls who should have been purged pursuant to the list maintenance requirements of the NVRA.  (Doc. 46 at 4-5; *id.* at ¶ 47).

Both Defendant Schmidt and Intervenor-Defendants seek dismissal of Plaintiffs initial and Supplemental Complaint.  (Docs. 53-54).  Specifically, they argue that both Complaints should be dismissed for, among other things, failure to plausibly allege Article III standing.

---

[9]    Relying on the EAVS, Plaintiffs' simplistic explanation in their Complaint for arriving at their conclusion with respect to the existence of 277,768 registrants who should have been removed from the voter rolls is as follows: According to the 2020 EAVS, Pennsylvania sent 753,942 confirmation notices to registered Pennsylvania voters prior to 2020 General Election and 116,042 registrants responded. Therefore 637,900 registrants who were sent the notices did not respond.  According to the 2022 EAVS, 360,132 registrants were removed after the November 8, 2022, election for failing to respond to notices. Therefore, according to Plaintiffs, 277,768 registrants should have been removed after the November 8, 2022 election.

In opposition, Plaintiffs rely on inapposite case law and a rather tortured reading of the NVRA. Most notable, however, is Plaintiffs utter failure to oppose Defendant's and Intervenor-Defendants' Article III standing cases and arguments. (Docs. 56, 57). Indeed, Plaintiffs ignore two recent Supreme Court decisions that greatly affect the standing analysis and were referenced throughout Defendant's and Intervenor-Defendants' briefs in support of their motions to dismiss.[10] As discussed more fully below, Plaintiffs fail to plausibly allege Article III standing because they fail to allege any injury-in-fact.

The Court will separately assess Article III standing as to each NVRA claim asserted by each of the plaintiffs. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) ("And standing is not dispensed in gross; rather, plaintiff must demonstrate standing for each claim that they press and for each form of relief they seek (for example, injunctive relief and damages)."). Moreover, as discussed, the Court must assess Plaintiffs' Article III standing at the time the Supplemental Complaint was filed— January 22, 2025. *See Lutter*, 86 F.4th at 125-26 ("But, if a district court permits a supplemental complaint, then for the claims and requested relief substantively affected by the alleged post-suit developments, a plaintiff's Article III standing is evaluated as of the date of the supplemental pleading.").

---

[10]    *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021); *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024)

i.    <u>Individual Standing</u>

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 409 (internal citation and quotation marks omitted). Put another way, "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* "Where, as here, a case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element." *Id.* (internal citation and quotation marks omitted).

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (internal citation and quotation marks omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be concrete." *Id.* "A concrete injury must be *de facto*; that is, it must actually exist." *Id.* "Concreteness, therefore, is quite different from

particularization." *Id.* "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* at 340. "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 341.

Defendant and Intervenor-Defendants assert that Plaintiff Golembiewski lacks Article III standing to assert the NVRA claim in Count II of the Supplemental Complaint. The Court agrees. Plaintiff Golembiewski's alleged injuries fails to satisfy Article III's requirements because any alleged injuries are neither particularized nor concrete. Moreover, any alleged injuries to Plaintiff Golembiewski are entirely speculative and amounts to nothing more than a generalized grievance against governmental conduct. Federal courts almost universally find that a plaintiff similarly situated to Golembiewski—who asserts abstract concerns and generalized grievances and fears about vote dilution and election integrity—lack Article III standing to assert those claims. *See, e.g., Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, 127 F.4th 534, 540 (4th Cir. 2025) ("The vote dilution caused by the counting of an unknown number of invalid third-party votes affects all voters in a State in the same way. That generalized injury cannot support Article III standing."); *Bognet v. Sec. Commonwealth of Pennsylvania*, 980 F.3d 336, 353 (3d Cir. 2020) ("And the purported vote dilution is also not concrete because it would occur in equal proportion *without* the alleged

procedural illegality."), *vacated as moot sub nom Bognet v. Degraffenreid*, 141 S.Ct. 2508

(2021); *United Sovereign Ams., Inc. v. Schmidt*, Civ. No. 1:24-CV-1003, 2025 WL 675453,

at *3 (M.D. Pa. Mar. 2, 2025) (petitioner "has alleged only that the general integrity of his

election will be undermined, and that is not a particularized injury"); *Republican Nat'l*

*Committee v. Benson*, 754 F. Supp. 3d. 773, 776-77 (W.D. Mich. 2024) ("First, the 'fear'

upon which the individual Plaintiffs rely is an insufficient basis for properly invoking federal-

court jurisdiction.  [In addition, the individual plaintiffs] "subjective concern about the integrity

of Michigan elections, including their professed concern about vote dilution, is the type of

generalized grievance common to all Michigan residents.  These concerns are not

particularized to [the individual plaintiffs]."); *Republican Nat'l Comm. v. Aguilar*, Case No.

2:24-cv-00518-CDS-MDC, 2024 WL 4529358, at *3-4 (D. Nev. Oct. 18, 2024) ("First,

Johnston's vote dilution claim is nothing more than a generalized grievance. . . .  A plaintiff

asserts a generalized grievance when they assert 'only the right, possessed by every

citizen, to require that the Government be administered according to law. . . .  Johnston's

fear of vote dilution can be raised by every and any voter in the State of Nevada.  Any

reduction in individual voting power due to independent acts of voter fraud are felt equally

by all voters in Nevada and do not present an individual and personal injury of the kind

required for Article III standing."); *Strong Communities Found. of Arizona Inc. v. Richer*, No.

CV-24-02030-PHX-KML, 2024 WL 4475248, at *8 (D. Ariz. Oct. 11, 2024) ("Accordingly,

even if Cahill's vote was diluted in the colloquial sense plaintiffs allege, that type of dilution

does not give Cahill particularized injury in fact because it is also suffered by every other

voter.  Cahill's voter dilution theory is therefore insufficient to establish her standing.");

*Republican Nat'l Comm. v. Burgess*, Case No. 3:24-cv-00198-MMD-CLB, 2024 WL

3445254, at *6 (D. Nev. July 17, 2024) ("Vote dilution has been repeatedly rejected by

federal courts, including this Court, as an insufficient injury in fact to support standing when

the alleged harm is predicated upon the counting of illegitimate or otherwise invalid ballots

and equally affects all voters in a state.")  (collecting cases).

Because Golembiewski has only alleged speculative and generalized grievances,

that are neither concrete nor particularized, the Court finds that he lacks Article III standing

to assert the claims alleged in Count II of the initial and Supplemental Complaint because

he fails to plausibly allege any cognizable injury-in-fact.  Accordingly, the Court need not

address the remaining elements of Article III standing, namely, traceability and

redressability.

ii.    **Associational Standing**

Because the Court has found Plaintiff Golembiewski fails to allege Article III

standing, it necessarily follows that Citizen AG cannot assert associational/representational

standing on behalf of Mr. Golembiewski or any unnamed Citizen AG member.  *See*

*Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, Civil Case No. SAG-24-

00672, 2024 WL 2053773, at *3 (D. Md. May 8, 2024) ("Plaintiffs also lack standing as

representatives of their members.  To maintain such standing, they must show that the

'members would otherwise have standing to sue in their own right.'") (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)), *aff'd* 127 F.4th 534 (4th Cir. 2025); *see also Judicial Watch, Inc. v. Illinois State Bd. of Elections*, No. 24 C 1867, 2024 WL 4721512, at *5 (N.D. Ill. Oct. 28, 2024) ("The Court agrees with the majority view that generalized concerns over vote dilution do not give rise to standing . . . The Court finds that Davis has not established an injury in fact, and that Judicial Watch, as an association that must rely on its members' injuries to possess standing, similarly lacks the injury in fact necessary to have standing for purpose of its Section 8(a)(4) claim."); *Strong Communities Found. Of Arizona Inc*, 2024 WL 4475248, at *8 (organizational plaintiffs' "acknowledgement that its members share the standing arguments of Cahill—who the court has determined lacks standing for purposes of this motion—is fatal to its representational standing argument."). Accordingly, Citizen AG fails to plead facts plausibly showing its associational/representational standing to sue on behalf of its members.

### iii.    **Organizational Standing**

The Court has already found that Plaintiff Golembiewski lacks Article III standing and that Citizen AG lacks associational/representational standing to sue on his behalf on the facts alleged in the initial and Supplemental Complaint as to Count II. The question now becomes whether Citizen AG has alleged sufficient factual content to give rise to a plausible claim for organizational standing under Article III. In *Food & Drug Administration v. Alliance*

*for Hippocratic Medicine*, 602 U.S. 367, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024)

("*Hippocratic Medicine*"), the Supreme Court discussed in detail whether the plaintiffs had

organizational standing under Article III.  In finding that the organizational plaintiffs lacked

Article III standing, the Court found that "an organization may not establish standing simply

based on the intensity of the litigant's interest or because of strong opposition to

government conduct, no matter how longstanding the interest and no matter how qualified

the organization."  *Id.* at 394.  If further found that a "plaintiff must show far more than simply

a setback to the organization's abstract social interest," and "an organization that has not

suffered concrete injury caused by a defendant's action cannot spend its way into standing

simply by expending money to gather information and advocate against the defendant's

action."  *Id.*  Simply put, "[a]n organization cannot manufacture its own standing in that way."

*Id.*

In the Supplemental Complaint, Plaintiff Citizen AG alleges the following, which it

claims plausibly establishes its Article III standing to pursue its claim alleged in Count II:

- Citizen AG "is a nonprofit organization organized under the laws of the State of Florida dedicated to educating American [sic] about their rights and advocating, protecting, and preserving American civil liberties and constitutional rights through an array of means that includes without limitation, engaging in litigation."  (Doc. 46 at ¶ 4).

- "Plaintiff Citizen AG's mission is to educate Americans about their rights and preserve our civil rights and liberties in the courts.  The organization fulfills its mission through public records request and litigation, among other means."  (*Id.* at ¶ 51).

- "Citizen AG is supported in its mission by tens of thousands of individuals across the nation. An individual becomes a member of Citizen AG by making a financial contribution, in any amount, to the organization. Members' financial contributions are by far the single most important source of income to Citizen AG and provide the means by which the organization finances its activities in support of its mission. Citizen AG in turn represents the interests of its members." (*Id.* at ¶ 52).

- "Over the past several years, Citizen AG's members have become increasingly concerned about the state of the nation's voter registration rolls, including whether state and local officials are complying with the NVRA's voter list maintenance obligations. They are concerned that failing to comply with the NVRA's voter list maintenance obligations impair the integrity of elections by increasing the opportunity for ineligible voters or voters intent on fraud to cast ballots." (*Id.* at ¶ 53).

- "Defendants' failure to comply with their NVRA voter list maintenance obligations burden the federal and state constitutional right to vote of all individual members of Citizen AG who are lawfully registered to vote in Pennsylvania by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted." (*Id.* at ¶ 54).

- "Protecting the voting rights of Citizen AG members who are lawfully registered to vote in Pennsylvania is germane to Citizen AG's mission. It also is well within the scope of the reasons why members of Citizen AG join the organization and support its mission." (*Id.* at ¶ 55).

- "Because the relief sought herein will inure to the benefit of Citizen AG members who are lawfully registered to vote in Pennsylvania, neither the claims asserted, nor the relief requested requires the participation of Citizen AG's individual members." (*Id.* at ¶ 56).

- "In response to the concern of its members, Citizen AG commenced a nationwide program to monitor state and local election officials' compliance with their NVRA list maintenance obligations. As part of this program, Citizen AG utilizes public record laws to request and receive records and data from jurisdictions across the nation about their voter list maintenance efforts. It

then analyzes these records and data and publishes the results of its finding to the jurisdictions, to its members, and to the general public." (*Id.* at ¶ 57).

- "Citizen AG concerns with Pennsylvania's list maintenance practices led it to send the October 2024 correspondence described in the complaint and to request documents relating to the state's list maintenance practices, and to analyze the Commonwealth's responses." (*Id.* at ¶ 58).

- "Citizen AG's concerns also led it to conduct analyses of Pennsylvania's registration rates, removal rates, Confirmation Notice statistics, and inactive rates." (*Id.* at ¶ 59).

- "Citizen AG has expended substantial resources, including staff time, investigating Defendants' failure to comply with the NVRA voter list maintenance obligations, communicating with Pennsylvania officials and concerned members about Defendants' failure, and researching statements made by Defendants in their correspondence." (*Id.* at ¶ 60).

- "The resources expended by Citizen AG to investigate, address, research and counteract Defendants' failure to comply with their NVRA voter list maintenance obligations are district from and above and beyond Citizen AG's regular, programmatic efforts to monitor state and local election officials' NVRA compliance." (*Id.* at ¶ 61).

- "Were it not for Defendants' failure to comply with their NVRA voter list maintenance obligations, Citizen AG would have expended these same resources on its regular, programmatic activities or would not have expended them at all.  Instead, it diverted its resources to counteract Defendants' noncompliance and to protect members' rights." (*Id.* at ¶ 62).

- "As a direct and proximate result of Defendants' acts and/or omissions and failures complained herein, Citizen AG has expended substantial resources, including staff time, investigating Defendants' failure to comply with their NVRA voter list maintenance obligations, communicating with Pennsylvania officials and concerned members about Defendants' failure, and researching statements made by Defendants in their correspondence." (*Id.* at ¶ 91).

- "The resources expended by Citizen AG to investigate, address, research, and counteract Defendants' failure to comply with their NVRA voter list maintenance obligations are distinct from and above and beyond Citizen AG's regular, programmatic efforts to monitor state and local election officials' NVRA compliance." (*Id.* at ¶ 92).

- "Were it not for Defendants' failure to comply with their NVRA voter list maintenance obligations, Citizen AG would have expended these same resources on its regular, programmatic activities or would not have expended them at all. Instead, Citizen AG diverted its resources to counteract Defendants' noncompliance and to protect members' rights." (*Id.* at ¶ 93).

Plaintiffs claim that the foregoing factual allegations are sufficient to establish Citizen AG's Article III standing as an organization to bring its claim in Count II. The Court disagrees.

As the Court previously observed, Citizen AG's allegations that it "expended substantial resources, including staff time, investigating Defendants' failure to comply with their NVRA voter list maintenance obligations, communicating with Pennsylvania officials and concerned members about Defendants' failure, and researching statements made by Defendants in their correspondence . . . on its face does not give rise to a cognizable injury under *Hippocratic Medicine*." (Doc. 20 at 17-18). As the Third Circuit has held, "organizations may not satisfy the injury in fact requirement by making expenditures solely for purposes of litigation, nor by simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285 (3d Cir. 2014) (citation omitted).

Both the initial and Supplemental Complaint fail to allege any cognizable injury-in-fact to Citizen AG as an organization. Specifically, Plaintiffs allegations that it "diverted its

resources to counteract" Pennsylvania alleged noncompliance with the NVRA fails under *Hippocratic Medicine*—a case which Plaintiffs ignore throughout their briefs.  More specifically, "an organization may not establish standing simply based on the intensity of the litigant's interest or because strong opposition to government conduct, no matter how longstanding the interest and no matter how qualified the organization."  *Hippocratic Medicine*, 602 U.S. at 394.  Moreover, Citizen AG "must show far more than simply a setback to the organization's abstract social interest," and an organization like Citizen AG "that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  *Id.*; *see id.* ("An organization cannot manufacture its own standing in this way.").  And nowhere in the Supplemental Complaint are any non-conclusory plausible allegations that Pennsylvania's list-maintenance obligations and efforts could have "directly affected and interfered with [Citizen AG's] core business activities."  *Id.* at 395.  Accordingly, the Court concludes that Citizen AG fails to plausibly allege Article III standing as an organizational plaintiff as to Count II.  Specifically, the Court finds that Citizen AG fails to plausibly allege any injury-in-fact to it as an organization.

Because the Court is dismissing this case on the basis failure to plausibly allege Article III standing, the Court declines to address Defendant and Intervenor-Defendants additional merits-based arguments, including the failure to provide the mandatory statutory

notice under the NVRA.[11]  However, the Court cautions that it has grave doubts about

Plaintiffs statutory standing for failing to provide any notice to Defendant Schmidt consistent

with the NVRA.

## C. Article III Standing - Count I

Count I of Plaintiffs' Complaint asserts that Defendants have failed to make

requested records available for inspection, in alleged violation of 52 U.S.C. § 20507(i).

Pursuant to § 20507(i), addressing the public disclosure of voter registration activities:

> **(1)** Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> **(2)** The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person

---

[11]    The Court notes that the NVRA notice requirement has been consistently interpreted as mandatory.  *See Scott v. Schedler*, 771 F.3d 831 835-36 (5th Cir. 2014) ("Although notice is framed here as permissive rather than mandatory, other NVRA provisions indicate that notice is mandatory.").

Further, the failure to provide notice is not jurisdictional, so any dismissal for failure to provide notice would be under Rule 12(b)(6), not Rule 12(b)(1).  "While Article III standing involves the Court's constitutional authority to decide a case, statutory standing 'goes to whether [the legislature] has accorded a particular plaintiff the right to sue under a statute' and 'does not limit the power of the court to adjudicate the case.'"  *Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, Civil Action No. 17-495, 2020 WL 1233557, at *2 (E.D. Pa. Mar. 12, 2020) (quoting *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015)). "As a result, the Third Circuit has held that a 'dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim,' and such arguments should be asserted under Rule 12(b)(6)." *Eddystone*, 2020 WL 1233557, at *2 (quoting *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73-74 (3d Cir. 2011)).

has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i).

In support of its claimed violation of § 20507(i), Plaintiffs allege that on or about October 4, 2024, "Citizen AG submitted a public records request to Secretary Schmidt's office pursuant to 52 U.S.C. § 20507(i) and in full compliance with the provisions of the Commonwealth's Right-to-Know Law." (Doc. 1 at ¶ 65). Plaintiffs allege that Defendants' response to Citizen AG's request was "due within 5 business days of receiving it, which was October 11, 2024" but that on October 11, 2024, the Secretary of State's office sent an "interim response" informing Plaintiffs that "it needed more time, until November 12, 2024, to send a final response." (Doc. 1 at ¶¶ 67-68). (*See also*, Doc. 1, Ex.3 (letter from "Eric" at Citizen AG to Pennsylvania Secretary of State requesting "specific information and records related to your compliance with Section 8 of the National Voter Registration Act and its relevant provisions that require inactive voters who have not voted for two (2) federal election cycles to be removed from your State's voter rolls"); Doc. 1, Ex. 4 (October 11, 2024 letter from Agency Open Records Officer of the Pennsylvania Department of State acknowledging that under the Pennsylvania Right-to-Know-Law ("RTKL") a written response to Citizen AG's request is due by October 11, 2024 but notifying Plaintiff that the "extent and nature of your request precludes a response within the five-day time period" and that pursuant to 65 Pa. P.S. § 67.902, "the Department of State will require up to an additional

30 days, *i.e.* November 12, 2024, in which to provide a final written response to your request")).

Plaintiffs' initial Complaint alleges that Secretary Schmidt's "interim response" "constitutes a denial [of Citizen AG's request] because November 12, 2024 is more than 30 days following the five business days allowed for in [65 P.S. § 67.901]".  (Doc. 1 at ¶ 68). Plaintiffs attempt to tie any alleged violation of the Pennsylvania RTKL to a violation of the NVRA by asserting that the "2022 Midterm Election took place on November 8, 2022, and therefore, records regarding the 2022 Midterm Election are less than two (2) years old and Pennsylvania is required to have, at a minimum, records that Citizen AG requested in its October 4, 2024 open records request pertaining to the 2022 Midterm Election in its possession pursuant to 52 U.S.C. § 20507(i)."  (Doc. 1 at ¶ 70).  Plaintiffs further contend that the "failure to produce or otherwise make available for inspection the records Citizen AG requested in its October 4, 2024, open records request violates the NVRA's public inspection provision, 52 U.S.C. § 20507(i) that requires Pennsylvania to maintain and make available for inspection the records Citizen AG requested for a minimum of two years." (Doc. 1 at ¶ 79).

In the Supplemental Complaint, (Doc. 46), Plaintiffs raise this claim again and continue to contend that Defendant Schmidt denied their records request.  These conclusory legal allegations regarding a denial of information are not entitled to be accepted

as true.[12]  Nevertheless, even accepting those allegations as true, the Supplemental Complaint still fails to plausibly allege Article III standing as to each plaintiff regarding the NVRA record inspection claims alleged in Count I.

i.  **Individual Standing**

To establish Article III standing, a plaintiff "bears the burden of establishing:  '(1) an injury-in-fact; (2) that is fairly traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision.'"  *Kelly v. RealPage, Inc.*, 47 F.4th 202, 211 (3d Cir. 2022) (quoting *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 356 (3d Cir. 2018)).  A "plaintiff need only allege that she was denied information to which she was legally entitled, and that the denial caused some adverse consequences related to the purpose of the statute."  *Id.* at 212.  "Whether framed as 'adverse effects' or a 'downstream consequence,' *TransUnion*, 141 S.Ct. at 2214, the upshot is the same:  a plaintiff seeking to assert an informational injury must establish a nexus among the omitted information to which she has entitlement, the purported harm actually caused by the specific violation, and the concrete interest that Congress identified as deserving of protection when it created the disclosure requirement."  *Kelly*, 47 F.4th at 212 (internal citation and quotation marks omitted).

---

[12]    As Plaintiffs noted in the Motion for Leave to File a Supplemental Complaint, (Doc. 40), "[o]n November 12, 2024, Defendant Schmidt's office advised that Citizen AG's request 'is granted and enclosed is a record responsive to your request.'"  *Id.* at 3; *see id.* ("The records Secretary Schmidt provided in granting Citizen AG's October 4, 2024 request...").

"In sum, rather than working a sea change to its informational injury jurisprudence, the Supreme Court in *TransUnion* simply reiterated the lessons of its prior cases:  namely, to stage a cognizable informational injury a plaintiff must allege that 'they failed to receive . . . required information,' and that the omission led to 'adverse effects' or other 'downstream consequences,' *TransUnion*, 141 S.Ct. at 2214, and such consequences have a nexus to the interest Congress sought to protect, *Spokeo*, 578 U.S. at 342." *Id.* at 214.  Put differently, a "plaintiff must show (1) the omission of information to which she claims entitlement, (2) adverse effects that flow from the omission, and (3) a nexus to the concrete interest Congress intended to protect by requiring the disclosure of information." *George v. Rushmore Servs. Ctr., LLC*, 114 F.4th 226, 235 (3d Cir. 2024) (internal citation and quotation marks omitted).

Recently, the Third Circuit addressed Article III standing under the NVRA in a similar situation as the matter here. *Pub. Interest Legal Found. v. Sec. Commonwealth of Pennsylvania*, __ F.4th__, 2025 WL 1199440 (3d. Cir. Apr. 25, 2025) ("*PILF I*").  That opinion was vacated as "having been issued prematurely," *see* 2025 WL *1242225*, and on April 29, 2025, the Third Circuit issued a new opinion in *PILF* ("*PILF II*"), __ F.4th__, 2025 WL 1232229 (3d Cir. Apr. 25, 2025).  In *PILF II*, the Third Circuit again vacated the district court's judgment, holding that the organizational plaintiff lacked Article III standing to assert claims under the NVRA public disclosure provision because they did not allege, and failed to prove, any informational injury sufficient to confer Article III standing.  Relying on

*TransUnion* and *Kelly*, the Third Circuit held that "it is insufficient for Article III standing purposes for a plaintiff asserting an informational injury from a violation of a statute that contains a public disclosure aspect as part of its overall scheme to allege only that he has been denied information. Rather, he must establish a nexus among a downstream consequence, his alleged harm, and the interest Congress sought to protect. Without such a nexus, a plaintiff can claim no informational injury standing." 2025 WL 1242229, at *6.

As to the first requirement, it is doubtful that Plaintiff Golembiewski even alleges that Defendant Schmidt failed to provide disclosure under the NVRA. Indeed, nowhere in the initial or Supplemental Complaint are any allegations that Plaintiff Golembiewski sought disclosure from Defendant Schmidt and was denied this information. And, as the October 4, 2024 records request attached to the Supplemental Complaint makes clear, the disclosure request does not mention Plaintiff Golembiewski at all, or purport to seek records on his behalf or on behalf of any other Citizen AG member. (Doc. 46-1).

Regarding the second requirement, Plaintiffs allege they have satisfied the second requirement by alleging that the omission of information allegedly caused by the Defendant had adverse effects/downstream consequences flowing from the omission. The Court's inquiry need not go further than step two, because Plaintiffs fail to allege any adverse effects/downstream consequences flowing from the alleged denial of information. Indeed, as to Mr. Golembiewski, there are no allegations in either in the initial or Supplemental Complaint as to any adverse effects/downstream consequences flowing from Defendant

Schmidt's purported denial of information.  In any event, the Court will also address the third step in the analysis—whether there is a nexus to the concrete interest Congress intended to protect by providing a disclosure provision in the NVRA.  "Here, as in *TransUnion*, we are presented with a statute with a purpose that goes farther than government transparency such as FOIA.  The required disclosure of certain records is merely one aspect of the statutory scheme in service of a greater purpose—that is, as we explain below, *the expansion of voter participation in federal elections.*"  *PILF II*, 2025 WL 1242229, at *4. (emphasis in original).  Accordingly, even if Mr. Golembiewski was denied any information, because he has alleged no downstream consequences flowing from Defendant Schmidt's alleged failure to disclose and failed to allege any nexus to the interest Congress sought to protect in the NVRA, the Court concludes that Mr. Golembiewski fails to allege Article III standing as to the public disclosure claim alleged in Count I.

Moreover, despite Plaintiffs assertion to the contrary, (Doc. 57 at 14-15), the mere denial of information, own its own, does not satisfy Article III's injury-in-fact requirement, because an "asserted information injury that causes no adverse effects cannot satisfy Article III."  *TransUnion*, 594 U.S. at 441-42.  Because Plaintiffs fail to identify any concrete adverse downstream consequences stemming from the purported denial of information sought through their records request, or a nexus to the interest Congress sought to protect in the NVRA, the Court concludes that Plaintiff Golembiewski lacks Article III standing to assert the claim alleged in Count I.  Indeed, nowhere in the Supplemental Complaint and

the exhibits attached thereto are any allegations that Plaintiff Golembiewski ever sought the requested records himself, let alone any allegations of the downstream consequences and nexus based on Defendant Schmidt's purported denial of this information.

### ii.    Associational Standing

Because Plaintiff Golembiewski lacks Article III standing to assert the NVRA record inspection claim alleged in Count I based on the facts alleged, it necessarily follows that Citizen AG lacks associational/representational standing to pursue these claims on his behalf or any other Citizen AG member behalf. *See Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, Civil Case No. SAG-24-00672, 2024 WL 2053773, at *3 (D. Md. May 8, 2024) ("Plaintiffs also lack standing as representatives of their members. To maintain such standing, they must show that the 'members would otherwise have standing to sue in their own right.'") (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)), *aff'd* 127 F.4th 534 (4th Cir. 2025). Accordingly, Citizen AG fails to plead facts plausibly showing its associational/representational standing to sue on behalf of its members as to the disclosure claim alleged in Count I.

### iii.    Organizational Standing

In their Supplemental Complaint, Plaintiffs allege the following, which it claims establish Article III organizational standing for Citizen AG for the records inspection claim alleged in Count I:

- "Citizen AG has been deprived of the opportunity to inspect and review records concerning voter list maintenance, which is critical towards its mission and frustrates its purposes of preserving constitutional rights and civil liberties, including those of its members such as Mr. Golembiewski, who himself is directly injured as a registered and eligible voter of the Commonwealth of Pennsylvania." (Doc 46. at ¶ 94).

- "Defendants' failure to comply with the NVRA public inspection provision has caused the aforesaid injuries and harm to Plaintiffs, and Defendants will continue to refuse to comply with the NVRA resulting in more injury to Citizen AG and Mr. Golembiewski absent the injunctive relief requested herein." (*Id.* at ¶ 95).

Notably, despite filing the Supplemental Complaint on January 22, 2025, Plaintiffs nevertheless still "asks this Court to issue an emergency ex parte temporary restraining order prohibiting Defendants from further violating 52 U.S.C. § 20507(i) and compel Defendants to provide public access to the records Citizen AG requested on October 4, 2025 by November 2, 2024." (*Id.* at ¶ 96). And, nowhere in the Supplemental Complaint's Prayer for Relief is any mention of seeking either declaratory or injunctive relief to remedy the alleged failure to disclose alleged in Count I. *Compare* Doc. 46 at 30-31 (no mention of public disclosure provision of NVRA or relief sought pertaining to this provision), *with* Doc. 1 at 23 (prayer for relief requested "(A) Issue an Order granting emergency *ex parte* temporary restraining relief that enjoins Defendants from continuing to violate NVRA's public inspection provision and compels Defendants to produce the records responsive to Plaintiffs' October 4, 2024 open records request as required pursuant to 52 U.S.C. § 20507(i); (B) Enter an order declaring that Defendants' October 11, 2024 denial of Citizen

AG's records request constitutes a violation of the NVRA public inspection provision, 52 U.S.C. § 20507(i)").

"An asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442; *see also Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 936 (5th Cir. 2022) ("Even if Plaintiffs had a right to the records sought, an issue we do not reach, they have not established an injury in fact.") (citing *Spokeo*, 578 U.S. at 341). Applying *TransUnion*, the Fifth Circuit held that an organization lacked Article III standing to assert an NVRA record inspection claim because they failed to identify "concrete harm from governmental failures to disclose" information and further failed to allege any "downstream consequences" it will suffer from failing to receive the information. *Scott*, 49 F.4th at 936-37. The same logic applies in this matter, as is further bolstered by the Third Circuit's recent opinion in *PILF II*.

In Count I Citizen AG alleges a failure to disclose under the NVRA. Based on the facts alleged, however, the Court finds that Citizen AG fails to allege a plausible cognizable injury under Article III of the United States Constitution. For the same reasons discussed above regarding Plaintiff Golembiewski failure to allege Article III standing as to the record inspection claim asserted in Count I, Citizen AG lacks organization standing under Article III because it fails to plausibly allege any adverse or concrete downstream consequences purportedly stemming from the alleged denial of its records request. In fact, as the Supplemental Complaint alleges, Defendant Schmidt provided documents responsive to

Plaintiffs on November 12, 2024.  (Doc. 46 at ¶¶ 47-48).  Moreover, Citizen AG fails to allege a "nexus among a downstream consequence, [its] alleged harm, and the interest Congress sought to protect."  *PILF II*, 2025 WL 1242229, at *6.  And "[w]ithout such a nexus, a plaintiff can claim no informational injury standing."  *Id.*  Accordingly, the Court concludes that Citizen AG fails to allege Article III standing based on the informational injury asserted in Count I of the initial and Supplemental Complaint.  *See Id.* at *9 ("In short, as an out-of-state public interest organization, that has adduced insufficient evidence of a nexus among any adverse effect or downstream consequences and a harm it has suffered because of the Secretary's refusal to provide access to the requested record under *TransUnion* and its progeny, PILF has no standing to sue.").

Because the Court is dismissing this case on the basis that Plaintiffs fail to plausibly allege Article III standing, specifically, the failure to allege injury-in-fact, the Court declines to address Defendant and Intervenor-Defendants additional merits-based arguments, including the failure to provide the mandatory statutory notice under the NVRA.  However, as discussed above, the Court has grave doubts as to whether Plaintiffs possess statutory standing under the NVRA.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant Schmidt and Intervenor-Defendants' motions to dismiss will be granted. Plaintiffs initial Complaint and Supplemental Complaint, (Docs 1, 46), will be dismissed without prejudice. Plaintiffs are granted leave to amend to plead facts plausibly establishing Article III standing. A separate order follows.

Robert D. Mariani
United States District Judge